## PHILLIPS *v.* ZONING COMMISSIONER OF HOWARD COUNTY

[No. 228, September Term, 1960.]

*Decided April 7, 1961.*

*Motion for clarification of opinion filed April 18, 1961, granted May 8, 1961, and opinion modified.*

104

The cause was argued before Brune, C. J., and Henderson, Hammond, Prescott and Horney, JJ.

*Richard H. Stevenson* and *Bernard F. Goldberg* for the appellants.

*Daniel M. Murray, Jr.,* for the appellee.

Horney, J., delivered the opinion of the Court.

The sole question on this appeal—arising out of an injunction proceeding instead of in a zoning case as might be expected—is whether the present use of a tract or parcel of land along the Baltimore-Washington Boulevard in Howard County as and for a junk yard constitutes a lawful nonconforming use.

No proceedings were taken by Johnny A. Phillips, Jr., and others (owners-appellants) to have the issue of a non-conforming use determined by the board of zoning appeals and the case came before the Circuit Court for Howard County on the bill of the zoning commissioner for an injunction. The chancellor granted an injunction prohibiting the owners-appellants from operating and using the premises as a junk yard and "more specifically for the purpose and use of wrecking, dismantling and burning motor vehicles, or removing or storing the parts thereof." The decree, however, reserved to the owners-defendants the right to use the building on the premises and the immediate area around it (but not the space or field in the rear of the building which had been used for pasture of goats and cows or left unutilized) for the "storage and sale of secondhand furniture, motor vehicles and other items,"

which the chancellor found was the only use employed as of the critical date.

In this posture of the case the question for this Court to decide is not whether there was "substantial evidence" to support the finding of the Board, but whether the chancellor was "clearly erroneous" in finding that the present use was unlawful with respect to the "junking" of motor vehicles on the property in question. See Maryland Rule 886 a. Thus, it appears that a review of the evidence as well as the applicable zoning regulations is necessary.

Under the original zoning regulations, adopted July 27, 1948, the subject property was zoned "Commercial B." Neither this classification nor any other in the original regulations allowed the use of land as a junk yard. However, under such regulations (Paragraph 5-A) the Zoning Commissioner was empowered, after a public hearing, to "permit any use of land or building in the Commercial B. District which does not adversely affect the public health, safety, morals or general welfare and which does not contravene the purpose and intent of [the zoning] regulations." There was no definition of a "junk yard," but the regulations (Paragraph 6-1) contained a provision permitting nonconforming uses provided they were in existence on or before the critical date. The privilege, however, was confined to "that part of a building or the extent of land actually used" at that time.

On January 12, 1954, the original zoning regulations were repealed and a more comprehensive zoning scheme was adopted. Under the new regulations, presently in effect, the subject property was zoned M-1 (Light Manufacturing), and again a junk yard was not permitted in this classification. However, the present regulations (§ 23-A-9) permit a junk yard on property zoned M-2 (Heavy Manufacturing) provided the Board of Zoning Appeals determines that such use would not be detrimental to the public health, safety, morals and general welfare or would prevent the most appropriate

use of the land. The present regulations (§ 30-A-16) define a junk yard as:

"Any open space or building, or both, where scrap metals, bottles, rags, including new clippings, rubber, paper or any discarded material of any kind is stored, handled, baled, packed, sold or reconditioned or *where motor vehicles are dismantled or wrecked or wrecked motor vehicles or parts are stored.*" [Italics supplied.]

The present regulations (§ 13-A-H) also permit existing nonconforming uses, but again such use is confined to that "part of a building" or to the "extent of land" actually used on the critical date. And, besides these limitations, the regulations (§ 13-B, C, D) further provide that once a nonconforming use has been changed to a higher classification it may not thereafter be changed to a lower classification; that such use may not be changed to a use of the same classification unless approved by the Board of Zoning Appeals;[1] and that a nonconforming use may not be extended or increased in size or changed in design and buildings may not be erected or extended on land without the approval of the Board.[2] The present regulations (§ 7-A-5) further provided that automobile, truck or farm equipment storage, sale and repair services are permissible in B-2 Districts, but the dismantling or wrecking of vehicles was specifically excepted.[3]

---

1. The original regulations (Paragraph 6-2-A) had permitted a change of a nonconforming use to a use of similar classification, but were silent as to higher or lower classifications.

2. The original regulations (Paragraph 6-2-B) had permitted an extension of a nonconforming use not exceeding sixty feet from the existing nonconforming use of land or building provided setback requirements were maintained. See *Board of Zoning Appeals v. Meyer*, 207 Md. 389, 114 A. 2d 626 (1955), where an extension of one hundred and twenty feet was allowed under the circumstances in that case.

3. The original regulations (Paragraphs 4-10 and 5-1) had per-

With regard to the critical date in the instant case, both parties assumed at the injunction hearing that January 12, 1954, was the critical date, but the chancellor subsequently concluded and so ruled, and the parties have concurred by filing a stipulation in this Court, that the correct critical date was July 27, 1948.

As might be expected the evidence concerning the existence or non-existence of a nonconforming use prior to the critical date is conflicting. Supporting the existence of a nonconforming use, there was evidence that the property in question had been purchased in 1946 for the purpose of using it for junking automobiles and that it had been used for that purpose ever since in conjunction with a general junk and secondhand furniture business. There was evidence that junked automobiles and piles of junk as well as used automobiles in running condition had been observed on the premises as early as July of 1946. There was evidence that the property was being used as what was characterized as a "junk yard" in 1947 and as proof thereof several photographs were produced, one showing children against a background of several automobiles in a good state of repair, one showing a truck or bus and several automobiles with some of the wheels removed, and one showing two automobiles in a bad state of repair but seemingly still intact. There was evidence that the former owner had purchased a "junker" in 1952. There was evidence that there were "auto parts all over the place" in 1953. And there was evidence that the present owner had been employed by the prior owner in 1955 or 1956 to cut up and burn automobiles.

On the other hand, there was considerable evidence rebutting the existence of a valid nonconforming use of the property on the critical date so far as the junking and burning

---

mitted automobile and truck sales and service in Commercial A and B Districts (which it seems would include a used car sales lot), but were silent as to the dismantling or wrecking of vehicles on the premises.

of motor vehicles thereon was concerned. There was evidence that the former owner had first used the premises as a used furniture warehouse and did not begin to buy used vehicles until about 1950, that such vehicles were not dismantled on the property but were sold and hauled away and that no automobiles were ever stored in the rear of the building prior to 1954. There was evidence that in 1947 the prior owner had the building filled with used furniture and fixtures and kept some of it as well as several trucks, automobiles and other vehicles on the outside, that subsequently he had begun to buy "war surplus" vehicles then on sale at Fort Meade and that prior to 1954 the automobiles on the property had been posted with "for sale" signs and were not "junked" but were sold as used automobiles. There was evidence that between 1949 and 1953 considerable furniture was repaired on the premises and taken to Virginia for sale and that during that time no vehicle was ever junked or burned on the premises. There was evidence that in September of 1954 and before, goats and cows were pastured in the back field where vehicles were presently being dismantled and burned and that the pasture did not begin to "get junked up" until 1957. And there was other testimony that the junking and burning were of comparatively recent origin.

On this evidence, the chancellor, in judging the weight of the evidence and the credibility of the witnesses who had known and observed the premises over a period of years, found as a fact that there had been no "wrecking, dismantling or burning of vehicles on the property prior to July 27th, 1948, so as to give such operations the present status of a lawful non-conforming use."

To summarize, the evidence seems to indicate, as the chancellor found, that what was in existence in 1948, as a non-conforming use of a used car lot and a store or warehouse for the storage and sale of secondhand furniture and fixtures and other used articles, had in 1960, by some sort of "creeping" process, developed into a full-fledged junk yard and shop, where, among other things, large numbers of worn out and wrecked motor vehicles were junked and burned.

The owner concedes that the use he is now making of the property constitutes a "junk yard," but contends that the chancellor was clearly erroneous on the evidence presented. The question then—since the owner was not precluded from using the building and the immediate area around it for the storage and sale of secondhand furniture, motor vehicles and miscellaneous articles—is whether the use of the premises for junking and burning of motor vehicles and the salvaging and storage of parts, is a new and different use (now absolutely forbidden in an M-1 zone) from that for which the premises were used prior to July 27, 1948.

Whether or not a nonconforming use can be enlarged or extended is ordinarily governed by the provisions of the local ordinances and regulations, and in this case, where the zoning regulations in effect when the nonconforming use vested not only impliedly prohibited a change from a classification as a "used car" lot to a lower classification as a lot for dismantling and wrecking of motor vehicles,[4] but definitely disallowed all use as a junk yard in any land district unless such use was approved by the Zoning Commissioner, it would seem that the power to deny the use of land as a "junk yard" necessarily included the power to prohibit the extension or enlargement of an existing nonconforming use as a secondhand furniture store and used car lot so as to encompass the added use of the premises as a junk yard for the junking and burning of automobiles. This is so because the spirit underlying zoning regulations is to restrict rather than increase nonconforming uses. 1 Yokley, *Zoning Law and Practice*, § 153; 2 Rathkopf, *Law of Zoning and Planning*, § 59-1; *Colati v. Jirout*, 186 Md. 652, 47 A. 2d 613 (1946). The question, however, as to what is an extension or enlargement of a nonconforming use is ordinarily one of fact,[5] and in de-

---

4. Logically it would seem that the dismantling, wrecking and burning of worn out or wrecked motor vehicles is far different and definitely more obnoxious than a used car lot and secondhand furniture store. Cf. *Parr v. Bradyhouse*, 177 Md. 245, 9 A. 2d 751 (1939).

5. It is noted that the present zoning regulations (§ 13-F) spe-

termining it the question in each case must stand on its own facts. 101 C.J.S., *Zoning,* § 189.

While it is true that mere intensification of a nonconforming use is permissible so long as the nature of use is not substantially changed, it is generally recognized that the right of a landowner to continue the same kind of use to which the property was devoted on the critical date does not confer on him a right to subsequently change or add to that use a new and different one amounting to a drastic enlargement or extension of the prior existing use. Yokley, *op. cit.,* § 152; Rathkopf, *op. cit.,* §§ 58-5, 60-1; 58 Am. Jur., *Zoning,* § 166; 101 C.J.S., *Zoning,* § 189, *supra.*

The courts generally disapprove—as a substantial departure from a vested nonconforming use—a change from one use to another. The rule in Maryland that a change from one nonconforming use to a new and different one constitutes an extension of the use is found in that line of cases which began with *Chayt v. Board of Zoning Appeals,* 177 Md. 426, 9 A. 2d 747 (1939), and has continued through a series of cases ending with *Boulevard Scrap Co. v. City of Baltimore,* 213 Md. 6, 130 A. 2d 743 (1957).[6] When, however, the zon-

cifically provide that whether a nonconforming use exists (or has been abandoned) shall be a *question of fact.*

6. Other cases in the *Chayt* line include *Knox v. City of Baltimore,* 180 Md. 88, 23 A. 2d 15 (1941); *Colati v. Jirout,* 186 Md. 652, 47 A. 2d 613 (1946); *Cleland v. City of Baltimore,* 198 Md. 440, 84 A. 2d 49 (1951); *Fritze v. Mayor & C. C. of Baltimore,* 202 Md. 265, 96 A. 2d 4 (1953); and *Shannahan v. Ringgold,* 212 Md. 481, 129 A. 2d 797 (1957).

For a case in point from another jurisdiction concerning a new and different use prohibited as a nonconforming use, see *President & Trustees of Village v. Meredith,* 88 N. Y. S. 2d 775 (App. Div. 1949), where the change was from the storage of poles, cables and pipes and the use of trucks from time to time to move such materials to the storage of tractors, freight trucks and busses and the daily use of such noisy and vibrating vehicles in and about the storage facility, the Appellate Division overruled a Special Term holding that "storage was storage" and held that the later use was new and different. For other out-of-state cases stating what constitutes a new and different use see *Town of Lexington v. Bean,* 172 N. E. 867 (Mass. 1930) [change from repairing trucks by private owner

ing regulations authorize it, an extension of a nonconforming use may be allowed. See *Board of Zoning Appeals v. Meyer,* 207 Md. 389, 114 A. 2d 626 (1955), another Howard County case, where a permissible extension was allowed. It is also true—depending, of course, on the provisions of the local regulations in each case—that a different rule may be applicable when the change involves a substitution of one nonconforming use for another of the same or a higher classification. *Higgins v. City of Baltimore,* 206 Md. 89, 110 A. 2d 503 (1955); *Nyburg v. Solmson,* 205 Md. 150, 106 A. 2d 483 (1954); *Hare v. Mayor & C. C. of Baltimore,* 200 Md. 477, 90 A. 2d 217 (1952); *Green v. Garrett,* 192 Md. 52, 63 A. 2d 326 (1949); *Parr v. Bradyhouse,* 177 Md. 245, 9 A. 2d 751 (1939). Cf. *Board of Zoning Appeals of Balto. County v. Gue,* 217 Md. 16, 141 A. 2d 510 (1958). Ordinarily, however, a change may not be made in a nonconforming use of a higher classification to one of a lower classification, as was the case here. *Roach v. Board of Zoning Appeals,* 175 Md. 1, 199 Atl. 812 (1938); *Lipsitz v. Parr,* 164 Md. 222, 164 Atl. 743 (1933). The reason for disallowing a change from one nonconforming use to another is because the lawful nonconforming use of land "must be held to contemplate only a continuation of substantially the same use which existed at the time of the adoption of the ordinance, and not some other and different kind of nonconforming use

---

to repair shop available to public generally]; *Kensington Realty Holding Corp. v. Jersey City,* 191 Atl. 787 (N.J.L. 1937) *aff'd* 196 Atl. 691 (1938) [change from a tearoom (formerly a doctor's office) to a funeral home]; *Killian v. Brith Sholom Congregation,* 154 S. W. 2d 387 (Mo. 1941) [change of part of a cemetery into a place for the display and sale of monuments]; *De Felice v. Zoning Board of Appeals,* 32 A. 2d 635 (Conn. 1943) [change from a "dry-screen" sand mining operation to a "wet sand classifier"]; *Sitgreaves v. Board of Adjustment,* 54 A. 2d 451 (N. J. 1947) [change from a garage to an auto repair shop]; *San Diego County v. Mc-Clurken,* 234 P. 2d 972 (Cal. 1951) [change from small movable gasoline tanks to a considerably larger underground tank]; and *Markey v. Danville Warehouse & Lumber Co.,* 259 P. 2d 19 (Cal. 1953) [change from nonindustrial use to a cement mixing operation].

112

which the owner of land subsequently finds to be profitable or advantageous." *In Re Botz v. Garrett,* 159 S. W. 2d 367, 372 (Mo. 1942).

In this case, where there was evidence to justify a finding that the use of the property in question as a junk yard was *not* a vested nonconforming use on the critical date, the chancellor in so finding was not clearly erroneous, and we are therefore without authority to set aside the decree granting the injunctive relief sought by the Zoning Commissioner. Rule 886 a.

For the reasons stated herein the decree will be affirmed.

*Decree affirmed; appellants to pay the costs.*