898 A.2d 449

**TRIP ASSOCIATES, INC. et al.**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE.**

**No. 58 Sept. Term, 2003.**

Court of Appeals of Maryland.

May 9, 2006.

John A. Austin, Towson, for Petitioners.

Sandra R. Gutman, Chief Sol. (Thurman W. Zollicoffer, Jr., City Sol., on brief), Baltimore, for Respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and JOHN C. ELDRIDGE, (Retired, Specially Assigned), JJ.

BELL, Chief Judge.

The question this case presents is whether the Board of Municipal and Zoning Appeals ("the Board") erred when it restricted the number of days per week the appellants could operate a valid nonconforming use. The appellants' property, located in the B–5–1 Zoning District in Baltimore City, is being used for the operation of "Club Choices," a nightclub and after-hours establishment that sometimes features adult entertainment. The Club is owned by the appellant, Anthony Dwight Triplin ("Triplin"), who also is the owner of Triplin Associates, Inc. ("Trip"), the other appellant.

Triplin purchased 1815–17 North Charles Street, the property at issue, in 1983. Prior to his purchase, the property had been a nightclub featuring adult entertainment, including male and female exotic dancing. The adult entertainment had been presented up to five nights a week since 1979. When Triplin purchased the property, the applicable zoning ordinance did not prohibit the use of the property as an adult entertainment facility. Nevertheless, Triplin reduced the number of nights of nude or exotic dancing from five to two nights per week, featuring music and comedy on the other nights. The Board

approved his use of the premise as an "after hours establishment" in 1992.[1] With this approval, the adult entertainment was presented after hours, exclusively.

On December 15, 1994, Ordinance No. 443 was enacted. That ordinance, codified at Baltimore City Code, Art. 30, § 8.0-6I, regulated adult entertainment businesses, "where persons appear in a state of total or partial nudity."[2] It also provided that "[a]ny adult entertainment business existing on September 10, 1993 is considered a nonconforming use, subject to all Class III regulations."[3] Baltimore City Zoning Code § 13-609. After this Ordinance was passed, Triplin continued to use the facility as a club that provided adult entertainment after hours. That use was unchallenged until April 14, 2000, when a Baltimore City zoning inspector issued a "Code Violation Notice and Order" to the Club. The violation notice charged:

"*ZONING VIOLATION*

"1. Using portion of premises for adult entertainment without first obtaining proper Adult Entertainment Ordi-

---

1. The Baltimore City Zoning Code, § 1-107(a), (b), defines "after hours establishment" to be "any banquet hall, dance hall, meeting hall, private club or lodge, or similar place that remains open after 2 a.m. on any day" and "includes a restaurant that provides live entertainment or dancing and remains open after 2 a.m. on any day."

2. Ordinance No. 443 originated as Bill No. 773, which repealed and recodified with amendments Ordinance No. 258. *See Mayor and City Council of Baltimore v. Dembo*, 123 Md.App. 527, 530, 719 A.2d 1007, 1009 (1998).

3. "Class III" is defined in the Baltimore City Zoning Code, § 13-401. In describing what is regulated by the subtitle, it states:
" § 13-401. Scope of subtitle.
"This subtitle applies to Class III nonconforming uses, which comprise:
"(1) any nonconforming use of all or part of a structure that was designated and erected primarily for a use that is no longer allowed in the district in which it was located;
"(2) any nonconforming use of the lot on which that structure is located; and
"(3) any nonconforming use of land or structures not regulated as Class I or Class II."

nance and Adult Entertainment License. DISCONTIN-UE SAID USE. REMOVE ALL STOCK, MATERIAL, EQUIPMENT, AND ANY ADVERTISING SIGNS AS-SOCIATED WITH SAID USE. OBTAIN CERTIFI-CATE OF OCCUPANCY BEFORE RE–ESTABLISH-ING ANY USE."

Triplin appealed to the Board. On appeal, Triplin testified that Club Choices featured exotic dancing and adult entertainment two times a week, Wednesdays and Fridays, for two hours each night. That testimony was confirmed by employees, who offered further that such dancing with partial nudity has been presented two nights per week since 1983.

The Board ruled:

"1 .... [A]dult entertainment may be continued two nights during the week.

"The Board finds that a non-conforming use of the premises for adult entertainment had been established prior to Ordinance 443 (adult entertainment business approved December 15, 1994) and may be continued under Subsection 13–402 [4] of the Zoning Code. The Board finds that with the above condition that the request would not be detrimental to or endanger the public health, security, general welfare, or morals or be injurious to the use and enjoyment of other property in the immediate vicinity, nor substantially diminish and impair property values in the neighborhood. Further, and as agreed by the appellant that this is specifically for the appellant Mr. Triplin, the owner and operator of the subject site and a copy of the resolution/decision is to be recorded in the land records of Baltimore City and the

---

4. Baltimore City Zoning Code § 13–402 provides:
   " § 13–402. Continuation of use.
   "Except as specified in this article, Class III nonconforming uses of structures may be continued, subject to the regulations of this subtitle."
   Regulations in the subtitle include, e.g., § 13–403, governing the "Repairs and alterations" of nonconforming use structures, § 13–404, governing the "Restoration of damaged structures," and § 13–405, governing the "Changes in use" of nonconforming use structures.

appellant is to provide to the Board a court certified copy to be placed in the file . . . as part of the record. The purpose of the recording requirement is to give the Charles North Community Association legal standing to enjoin any uses as adult entertainment to a subsequent purchaser, owner, lessee or operator. . . .

"In accordance with the above facts and findings and subject to the aforementioned condition, (adult entertainment two nights a week only) the Board approves the application."

Board of Municipal and Zoning Appeals, Appeal No. 327–00X, October 12, 2000. Thus, the Board, despite finding that Club Choices was a valid nonconforming use, limited that use, based on the testimony, to two nights per week.

Triplin petitioned the Circuit Court for Baltimore City for judicial review of the Board's decision. That court affirmed the Board's decision and, in addition, ruled that Triplin needed to "apply for and obtain all necessary and relevant licenses required by the City for the operation of an adult entertainment business." Upholding the Board's power to impose the two night per week restriction, it reasoned [5]:

---

5. This rationale was offered in answer to Triplin's motion for reconsideration, in which he claimed that the Circuit Court had reviewed the incorrect Board decision, one filed on March 9, 1992, approving Club Choices status as an after hours establishment, as opposed to the Board's findings of October 12, 2000.

Thereafter, Triplin filed a motion to revise the judgment. In that motion, he maintained that the Circuit Court had erred in its interpretation of the subject zoning ordinance. Particularly, he argued that the Circuit Court's use of the word "conditional" was an indication that the court was applying the conditional use standard to the resolution of a nonconforming use problem. Rejecting that argument, the court held:

"There is no question as to the right of the appellants to continue the enjoyment of the nonconforming use of their premises for adult entertainment without the necessity of an ordinance, but still subject to the obligation to be licensed for that use. The use of the word 'conditional' was in that context. In other words, the nonconforming use itself, both with reference to its history and to its contemporary exercise, according to uncontroverted evidence before the Board, was not unconditional. It was "conditioned" by the limit of two nights per week. This historic "condition," or more aptly, limit, was con-

"the Board had authority to impose certain conditions when granting the non-conforming use designation to the appellant ... There was substantial evidence presented at the October 13, 2000 hearing upon which the Board could rely upon for the condition. While the Board heard testimony that confirmed the non-conforming use history of its property, the Board also heard testimony that the non-conforming use only occurred two nights a week, at least for the past 17 years. ... By its very nature, a conditional use is a deviation from the land use norm in its location; and often requires particularized attention to protect or buffer the surrounding affected community from its potentially harmful effects. ... Limiting the appellant to 2 days a week is neither irrational nor lacking legal basis. It is a reasonable condition that continues the present practice."

*Trip Associates, Inc. v. Mayor and City Council of Baltimore,* Circuit Court for Baltimore City, Case No. 24–C–00–005345 (June 14, 2001).

Triplin noted an appeal to the Court of Special Appeals, *Trip Assoc. Inc. v. Mayor & City Council of Baltimore,* 151 Md.App. 167, 824 A.2d 977 (2003), in which he challenged the Board's power temporally to restrict the nonconforming use and the ruling by the Circuit Court that he obtain an adult entertainment license in order to avoid abandonment of the nonconforming use. The intermediate appellate court agreed with Triplin that the Circuit Court erred in ordering Triplin to obtain an adult entertainment license. It affirmed the judgment, however, insofar as the Board's power to restrict the nonconforming use was concerned, concluding that the restric-

---

firmed by appellants in their testimony to the Board. In other words, the exercise of the nonconforming use was, by its very nature, limited to two nights per week. Appellants enjoyed a nonconforming use of adult entertainment two nights per week. Consequently, it is fair to clarify the status recognized by the June 14, 2001 opinion of this Court as a nonconforming use of two nights per week, rather than a nonconforming use "conditioned" by a two nights per week limit." *Trip Associates, Inc. v. Mayor and City Council of Baltimore,* Circuit Court for Baltimore City, Case No. 24–C–00–005345 (September 25, 2001).

tion placed on Club Choices was neither plain error, 151 Md.App. at 175, 824 A.2d at 982, nor unconstitutional. 151 Md.App. at 177, 824 A.2d at 983. Focusing on § 13–406,[6] which prohibits the expansion, "in any manner," of a Class III nonconforming use, 151 Md.App. at 175, 824 A.2d at 982, the Court of Special Appeals interpreted that provision as permitting the Board, because it had been presented with evidence of precisely how the property was being used—adult-entertainment twice a week—when the zoning ordinance prohibiting that use was enacted, to define the future further use in exactly the same way, as permitting "Triplin to continue to do what he had done since he acquired the club in 1983," 151 Md.App. at 176–177, 824 A.2d at 982–983, and no more.[7]

Underlying the Court of Special Appeals' decision was Maryland's well-established policy against the expansion of nonconforming uses. 151 Md.App. at 176, 824 A.2d at 982, *citing County Council v. Gardner, Inc.,* 293 Md. 259, 268, 443 A.2d 114, 119 (1982). The intermediate appellate court also relied on out-of-state cases, in which temporal restrictions placed on the continued use of valid nonconforming uses were upheld as consistent with the policy against the expansion of such uses,

---

**6.** Baltimore City Zoning Code § 13–406 provides:

"Except as authorized by the Board under Subtitle 7 {"Modifications and Continuances by Board"} of this title, a Class III nonconforming use may not be expanded in any manner, nor may any structure be erected or expanded on any nonconforming use of land, unless the use of the land and structure is made to conform to the regulations of the district in which the structure is located."

**7.** To the extent that the Court of Special Appeals is viewing the testimony as defining the scope of the nonconforming use, rather than as proof of the fact of the existence of such use, its analysis is flawed. To be sure, a finding that the property was being used in the manner reflected in the testimony is supported by the evidence and constitutes substantial evidence of that fact, as the intermediate appellate court recognized, but that testimony is also support for a finding that the property was being used for a nonconforming use. Testimony, given at a hearing to determine whether a property is, or is not, a valid nonconforming use, as to the manner in which a property is actually used, simply establishes the nonconforming use, not its scope. If it were otherwise, the intensification cases, discussed *infra,* would be undermined and, effectively overruled, and a new doctrine established.

on the theory that, without them, the nonconforming use would be expanded. *Garb–Ko v. Carrollton Township*, 86 Mich.App. 350, 272 N.W.2d 654 (1978) (holding that township board could restrict the operating hours of nonconforming grocery store in view of the policy against expansion of nonconforming uses); *Incorporated Village v. 280 Hillside Ave. Rest. Corp.*, 55 A.D.2d 927, 390 N.Y.S.2d 637 (1977) (holding that a nonconforming use was unlawfully extended by increase in hours of operation); *Time–Low Corp. v. City of LaPorte Bd. of Zoning Appeals*, 547 N.E.2d 877 (Ind.Ct.App. 1989) (holding that the zoning board had authority, in approving a change to a nonconforming filling station, to restrict its hours of operation); *Cornell Uniforms, Inc. v. Township of Abington*, 8 Pa.Cmwlth. 317, 301 A.2d 113 (1973) (holding that a zoning board had the authority to impose a condition that a nonconforming dry cleaning establishment operate in the same time frame in which it had previously operated).

The Court of Special Appeals addressed an issue which it perceived not to have been raised by either party, that of whether the offering of adult-entertainment for more than two nights per week constituted an "intensification" of the nonconforming use, rather than an expansion of that use. Acknowledging that our decisions in *Jahnigen v. Staley*, 245 Md. 130, 225 A.2d 277 (1967) (increasing the number of rowboats that a marina was able to rent), *Feldstein v. LaVale Zoning Board*, 246 Md. 204, 227 A.2d 731 (1967) (increasing quantity and height of scrap metal stored in junkyard), and *Nyburg v. Solmson*, 205 Md. 150, 106 A.2d 483 (1954) (increasing the parking and storage of cars on a nonconforming lot) recognized a distinction between the more intensive use of property and the expansion of a nonconforming use, the intermediate appellate court characterized a temporal modification of a nonconforming use as an expansion of that use, rather than a mere intensification of it. In justification of that characterization, the court said:

"[T]o hold that a temporal extension of operating hours is an intensification, not an expansion, of a non-conforming use undermines governmental efforts to reconcile public policy

with private interest. If we were to so rule, localities would be presented with the harsh choice of either tolerating the growth of an undesirable use or eliminating it all together. Depriving localities, as such a ruling would, of a milder-alternative—that of restricting a nonconforming use to its current level—benefits neither the regulating locality nor nonconforming property owners, whereas holding, as we do, that the Board had a right to control temporal expansions of use accommodates the interests of both."

151 Md.App. at 180–181, 824 A.2d at 985.[8]

Triplin filed a petition with this Court for a writ of certiorari, which we granted. *Trip v. Baltimore,* 377 Md. 112, 832 A.2d 204 (2003). We shall reverse.

## A.

■ Title 13 of the Baltimore City Zoning Code establishes the zoning districts in Baltimore, and "provides for the regula-

---

**8.** The Court of Special Appeals was aware of *Green v. Garrett,* 192 Md. 52, 63 A.2d 326 (1949). Indeed, the Court of Special Appeals conceded that *Green* does support Triplin's view that a temporal expansion of a nonconforming use is a mere intensification of the use and not an unlawful expansion. It dismisses *Green* as of little precedential value, reasoning:

"*Green* was decided before the zoning administrative process was created. Therefore, considerations such as the deference owed an administrative body's interpretation of its governing statute and the substantial evidence rule played no role in the Court's decision."

*Trip Associates, Inc. v. Mayor and City Council of Baltimore,* 151 Md.App. 167, 180, 824 A.2d 977, 985 (2003). It added:

"[T]o hold that a temporal extension of operating hours is an intensification, not an expansion, of a non-conforming use undermines governmental efforts to reconcile public policy with private interest. If we were to so rule, localities would be presented with the harsh choice of either tolerating the growth of an undesirable use or eliminating it altogether. Depriving localities, as such a ruling would, of a milder alternative-that of restricting a nonconforming use to its current level-benefits neither the regulating locality nor nonconforming property owners, whereas holding, as we do, that the Board had a right to control temporal expansions of use accommodates the interests of both."

*Id.* at 180–181, 824 A.2d at 985.

We are not persuaded, the reasons for which we shall demonstrate *infra.*

tion of nonconforming uses and noncomplying structures existing in the various districts." Baltimore City Zoning Code § 13–102. Under the Baltimore City Zoning Code, a "nonconforming use" is defined as "any lawfully existing use of a structure or of land that does not conform to the applicable use regulations of the district in which it is located." Baltimore City Zoning Code § 13–101(c). A valid and lawful nonconforming use is established if a property owner can demonstrate that before, and at the time of, the adoption of a new zoning ordinance, the property was being used in a then-lawful manner for a use that, by later legislation, became non-permitted. *See, e.g., Chayt v. Board of Zoning Appeals of Baltimore City,* 177 Md. 426, 434, 9 A.2d 747, 750 (1939) (concluding that, to be a nonconforming use, an existing business use must have been known in the neighborhood as being employed for that given purpose); *Lapidus v. Mayor and City Council of Baltimore,* 222 Md. 260, 262, 159 A.2d 640, 641 (1960) (noting that an applicant claiming that a nonconforming use had been established before the effective date of the city zoning ordinance needed to prove that the use asserted existed prior to the date of the ordinance); *Vogl v. City of Baltimore,* 228 Md. 283, 288, 179 A.2d 693, 696 (1962) (holding that the party claiming the existence of a nonconforming use has the burden of establishing the existence of the use at the time of the passage of the prohibiting zoning ordinance). *See also Lone v. Montgomery County,* 85 Md. App. 477, 496, 584 A.2d 142, 151 (1991).

◼ As the Court of Special Appeals recognized, nonconforming uses are not favored. *County Council v. Gardner, Inc.,* 293 Md. at 268, 443 A.2d at 119 ("These local ordinances must be strictly construed in order to effectuate the purpose of eliminating nonconforming uses."); *Grant v. Mayor and City Council of Baltimore,* 212 Md. 301, 308, 129 A.2d 363, 365 (1957) ("Indeed, there is general agreement that the fundamental problem facing zoning is the inability to eliminate the nonconforming use"); *Colati v. Jirout,* 186 Md. 652, 657, 47 A.2d 613, 615 (1946) (noting that the spirit of the Baltimore City Zoning Ordinance is against the extension of non-con-

forming uses). Indeed, in *Grant*, this Court stated, "[T]he earnest aim and ultimate purpose of zoning was and is to reduce nonconformance to conformance as speedily as possible with due regard to the legitimate interests of all concerned." 212 Md. at 307, 129 A.2d at 365. The context for this conclusion was the historical development of the nonconforming use, which the Court also detailed:

"Nonconforming uses have been a problem since the inception of zoning. Originally they were not regarded as serious handicaps to its effective operation; it was felt they would be few and likely to be eliminated by the passage of time and restrictions on their expansion. For these reasons and because it was thought that to require immediate cessation would be harsh and unreasonable, a deprivation of rights in property out of proportion to the public benefits to be obtained and, so, unconstitutional, and finally a red flag to property owners at a time when strong opposition might have jeopardized the chance of any zoning, most, if not all, zoning ordinances provided that lawful uses existing on the effective date of the law could continue although such uses could not thereafter be begun."

*Id.*

Nevertheless, a "nonconforming use is a vested right entitled to constitutional protection." *Amereihn v. Kotras*, 194 Md. 591, 601, 71 A.2d 865, 869 (1950). The Court in *Amereihn* made that point forcefully. There, after the area in which a light manufacturing plant was located was zoned as residential, the neighbors brought a complaint, praying that the new owners of the plant be restrained from using the property for manufacturing purposes. This Court, in ruling against the neighbors, pointed out:

"If a property is used for a factory, and thereafter the neighborhood in which it is located is zoned residential, if such regulations applied to the factory it would cease to exist, and the zoning regulation would have the effect of confiscating such property and destroying a vested right

therein of the owner. Manifestly this cannot be done, because it would amount to a confiscation of the property." 194 Md. at 601, 71 A.2d at 869 (citations omitted). *See also Board of Zoning Appeals of Howard County v. Meyer*, 207 Md. 389, 114 A.2d 626 (1955), in which the Court of Appeals held that an owner of a truck manufacturing plant on land that had been rezoned as residential had a valid nonconforming use, observing, "[t]he law is established that the zoning of an area as residential cannot apply to a previously established factory in that area, which is entitled under the circumstances to constitutional protection." 207 Md. at 394, 114 A.2d at 628.

A nonconforming use may be reduced to conformance or eliminated in two ways: by "amortization," that is, requiring its termination over a reasonable period of time, and by "abandonment," *i.e.* non-use for a specific of time. Thus, in *Grant*, the Court held that an amortization period of five years to remove nonconforming billboards was valid, and that a five-year period was not an arbitrary time period. 212 Md. at 316, 129 A.2d at 370. *See Donnelly Advertising Corp. of Maryland v. Mayor and City Council of Baltimore*, 279 Md. 660, 671, 370 A.2d 1127, 1134 (1977). *See also Chesapeake Outdoor Enterprises, Inc. v. Mayor and City Council of Baltimore*, 89 Md.App. 54, 597 A.2d 503 (1991) (holding that even assuming a valid nonconforming use, municipality was nonetheless entitled to summary judgment requiring that signs be taken down, because ordinances contained amortization periods, validated by court decisions, requiring that such signs be taken down over a period of time even if constituting nonconforming uses, and all such amortization periods had long since expired); *Harris v. Mayor and City Council of Baltimore*, 35 Md.App. 572, 371 A.2d 706 (1977) (holding that a court is not restricted, in determining constitutional reasonableness of amortization provision, to consideration of the original amortization period or its later extension, due to the passage of time since the enactment of those provisions). So long as it provides for a reasonable relationship between the amortization and the nature of the nonconforming use, an ordinance prescribing such amortization is not unconstitutional. *Gough v. Board of Zon-*

*ing Appeals for Calvert County,* 21 Md.App. 697, 704–705, 321 A.2d 315, 319 (1974). *See also Grant,* 212 Md. at 316, 129 A.2d at 370; *Colati,* 186 Md. at 657, 47 A.2d at 615.

The Baltimore City ordinance takes the "abandonment" approach. Section 13–406, as we have seen, prohibits the expansion of any nonconforming use, except as authorized by the Board.[9] Under § 13–407, "Discontinuance or abandonment," the failure actively and continuously to operate the nonconforming use results in its abandonment. That section provides:

"(a) *Discontinuance or abandonment*

"(1) Except as specified in this section, whenever the active and continuous operation of any Class III nonconforming use, or any part of that use, has been discontinued for 12 consecutive months:

"(I) the discontinuance constitutes an abandonment of the discontinued nonconforming use, or discontinued part of that use, regardless of any reservation of an intent to resume active operations or otherwise not abandon the use; and

"(ii) the discontinued nonconforming use, or discontinued part of that use:

"(A) may not be reestablished; and

"(B) any subsequent use of any part of the land or structure previously used for the discontinued use, or discontinued part of that use, must conform to the regulations of the district in which the land or structure is located.

"(2) In accordance with Subtitle 7 {"Modifications and Continuances by Board"} of this title, the Board may extend the time limit for discontinuance for 1 or more

---

9. The Board authorization is pursuant to Subtitle 7. That Subtitle, captioned "Modifications and Continuances By Board," permits the Board to "modify," that is, "expand, change, alter, or move," § 13–701, an existing nonconforming use.

additional periods. In no case, however, may the total of the additional time exceed 12 months."

Abandonment, as the foregoing ordinance confirms, focuses not on the owner's intent, but rather, on whether the owner failed to use the property as a nonconforming use in the time period specified in the zoning ordinance. *See Catonsville Nursing Home, Inc. v. Loveman,* 349 Md. 560, 581, 709 A.2d 749, 759 (1998) ("There is no hard and fast rule in nonconforming use abandonments that intent to abandon must be actually shown when the zoning ordinance or statute utilizes the word 'abandonment' ").

■ On the other hand, the abandonment or discontinuance must be active and actual. In *Mayor and City Council of Baltimore v. Dembo, Inc.,* 123 Md.App. 527, 719 A.2d 1007 (1998), the Court of Special Appeals discussed whether the failure of a property owner to apply for a license to operate an adult entertainment business after the passage of an ordinance, in that case, Ordinance 443, the same one as involved in this case, which prohibited such business in the district in which it was located, constituted "abandonment" of the nonconforming use, notwithstanding that he had actually used the property in that nonconforming manner throughout the subject period. There, Donald Dembo owned an adult entertainment establishment called the "Gentleman's Gold Club" ("the Gold Club") which, like Triplin's club, was located in a zoning district in which it was not permitted. Like Club Choices, however, the Gold Club's use was a valid nonconforming use, having pre-existed the ordinance that excluded that use. The city argued that, by using the property without the required license for two years, Dembo had essentially terminated his once lawful nonconforming use. Addressing for the first time whether or not a failure to apply for a license constituted an abandonment of a lawful nonconforming use, the Court of Special Appeals, after analyzing how other jurisdictions approached the issue, concluded:

"We shall follow the majority of jurisdictions and apply the rule that a valid nonconforming use will not be forfeited by the failure of the business owner to secure a license to

operate his business. We consider that this rule accords reasonable protection to the property right that has been long recognized under Maryland law as a vested right subject to constitutional protection."

123 Md.App. at 541, 719 A.2d at 1015. Furthermore, the Court of Special Appeals held that, even without the license, "Dembo retain[ed] its vested nonconforming use status to operate a business with adult entertainment . . .".

There is no issue with regard to Club Choices' status; it is a valid Class III nonconforming use property under § 13–609 of the Zoning Code. It is an adult-entertainment business, presently existing, that was also operating as such on September 10, 1993, as § 13–609 specifies. As to that status, there is no contention that Triplin has abandoned or discontinued it, at least in whole. The issue is, as the Court of Special Appeals has framed it, whether using the valid nonconforming use more frequently than it was being used when the use became nonconforming—presenting adult entertainment more than two nights per week—would be a prohibited expansion of the use or a mere intensification of the use.

### B.

■ Despite Maryland's well settled policy against nonconforming use, *see County Council v. Gardner, Inc.*, 293 Md. at 268, 443 A.2d at 119 ("Whether a nonconforming use can be changed, extended, enlarged, altered, repaired, restored, or recommenced after abandonment ordinarily is governed by the provisions of the applicable local ordinances and regulations . . . [t]hese local ordinances must be strictly construed in order to effectuate the purpose of eliminating nonconforming uses"); *Colati v. Jirout*, 186 Md. at 655, 47 A.2d at 614 ("[T]he [Baltimore City] Zoning Ordinance prohibits generally the extension of a non-conforming use except to the portion of the building designed for such use at the time of the passage of the ordinance, and . . . the stopping of expansion of a nonconforming use is not an arbitrary or unreasonable exercise of governmental power"); *Grant*, 212 Md. at 307, 129 A.2d at 365

("[T]he earnest aim and ultimate purpose of zoning was and is to reduce nonconformance to conformance as speedily as possible with due regard to the legitimate interests of all concerned"), and the Baltimore City Zoning Code's explicit prohibition against expansion of those uses, Baltimore City Zoning Code § 13–406, Maryland recognizes, and our cases have held, that an intensification of a nonconforming use is permissible, so long as the nature and character of that use is unchanged and is substantially the same. *See Feldstein v. LaVale Zoning Board,* 246 Md. 204, 211, 227 A.2d 731, 734; *Jahnigen v. Staley,* 245 Md. 130, 137, 225 A.2d 277, 281; *Nyburg v. Solmson,* 205 Md. 150, 161, 106 A.2d 483, 488; *Green v. Garrett,* 192 Md. 52, 63, 63 A.2d 326, 330. *See also Kastendike v. Baltimore Ass'n for Retarded Children, Inc.,* 267 Md. 389, 396–98, 297 A.2d 745, 749–50 (1972); *Parr v. Bradyhouse,* 177 Md. 245, 247, 9 A.2d 751, 752 (1939) (determining that rental of tract of land formerly used for a dairy business for riding academy did not affect the right to use the land as a non-conforming use, as it was simply a change from cows to horses).

In *Green, supra,* 192 Md. 52, 63 A.2d 326, citizens of Baltimore City sought to enjoin the Department of Recreation and Parks of Baltimore City and the Baltimore Baseball and Exhibition Company from allowing professional baseball to be played at Baltimore Stadium, and further to enjoin the use of the loud speaker system, the flood lights, and the parking facilities nearby. Baltimore Stadium was constructed prior to 1931, when the district in which it was located was rezoned residential, 192 Md. at 63, 63 A.2d at 330, after which it was used infrequently for football games, track meets and civic events. It was used more frequently after 1939, when lights were installed, a speaker system having been installed earlier. 192 Md. at 57, 63 A.2d at 327–328. That increased use consisted mainly of football games and other events, not baseball games. In 1944, however, a fire destroyed the baseball stadium, then known as Oriole Park. This resulted in more baseball games being played at Baltimore Stadium. 192 Md. at 57–58, 63 A.2d at 328.

When that occurred, neighboring citizens contended that the use of the Stadium for baseball games for a considerable portion of the year was an enlargement of the valid nonconforming use of the Stadium and, therefore, contravened the zoning ordinance. 192 Md. at 63, 63 A.2d at 330. They pointed out that, when the zoning ordinance was enacted, the nonconforming use consisted of professional football games and the infrequent, at best, baseball game. This Court disagreed. *Id.* Acknowledging that the "spirit of the zoning ordinance is against the extension of non-conforming uses and that such uses should not be perpetuated any longer than necessary," we observed:

> "We have never held that the more frequent use of a property for a purpose which does not conform to the ordinary restrictions of the neighborhood is an extension of an infrequent use of the same building for a similar purpose. We do not think such a contention is tenable. Nor does it seem to us that a different use is made of the Stadium when the players of games there are paid. The use of the property remains the same."

192 Md. at 63, 63 A.2d at 330. This Court concluded, "we find that the Department had and has power to lease the Stadium ... for the purposes of professional baseball, and that such use is not an extension of the non-conforming use heretofore existing ..." 192 Md. at 63–64, 63 A.2d at 330–331.[10]

---

**10.** As important to the Court of Special Appeals as its perception that *Green v. Garrett,* 192 Md. 52, 63 A.2d 326 (1949) has limited or no precedential value, 151 Md.App. at 180, 824 A.2d at 985, is the fact that:

> "In limiting the presentation of adult entertainment by the club to its present level, the Board interpreted this prohibition against expanding a non-conforming use to include a temporal expansion of such a use. As an 'interpretation and application' of a law which the Board administers, that decision must be given 'considerable weight.' "

*Id.* at 175, 824 A.2d at 982, *citing* and *quoting Board of Physician Quality Assurance v. Banks,* 354 Md. 59, 69, 729 A.2d 376, 381 (1999). We disagree. To be sure, deference should be given to the interpretations of their enabling legislation by the agencies charged with administering them. That does not mean, however, mere acquiescence or abdication of the judicial responsibility. Notwithstanding the deference

In *Nyburg v. Solmson,* 205 Md. 150, 106 A.2d 483 (1954), this Court addressed the question of whether increased usage of nonconforming property constituted an unlawful extension of that use or was simply an intensification of the use. At issue was property on which a garage had been built in 1920, on which cars of nearby residents were parked. In front of the garage was an open area, "some 164 feet by 129 feet." 205 Md. at 153, 106 A.2d at 484. In 1931, after the neighborhood where the garage was located had been classified as a residential use district, the garage operation continued without change. 205 Md. at 153, 106 A.2d at 484. In 1950, the owners of the garage contracted with a new car company to use the open space for the storage of new cars. 205 Md. at 154, 106 A.2d at 484. In 1953, a complaint was made by neighbors that the property was being used in violation of the zoning ordinance. 205 Md. at 154, 106 A.2d at 484. The Board of Municipal and Zoning Appeals held that, while the garage owner had a valid nonconforming use for parking, storage and washing motor vehicles and the sale of gasoline and accessories, that use was restricted by the nature and extent of the use to which the open area in front of the garage was put in 1931, the result of which was that no more than ten vehicles could be stored on the lot at any one time. 205 Md. at 154, 106 A.2d at 484–485. The Baltimore City Court reversed, striking down the restriction "since it amounted to an attempted prohibition of a legally valid intensification of use." 205 Md. at 156, 106 A.2d at 485. On appeal, this Court rejected the appellant's argument that, without the restriction the zoning board placed on the number of cars that could be stored in the open space, there would be a prohibited extension of a non-conforming use. 205 Md. at 161, 106 A.2d at 488. Explaining our decision, this Court held:

"[H]ere there is not an extension but merely an intensification of a long continued non-conforming use. In *Green v.*

---

due the agency, "it is always within our prerogative to determine whether an agency's conclusions of law are correct." *Kushell v. Department of Natural Resources,* 385 Md. 563, 576, 870 A.2d 186, 193 (2005).

*Garrett,* . . . [t]his Court held that . . . 'more frequent use of
a property for a purpose which does not conform to the
ordinary restrictions of the neighborhood is an extension of
an infrequent use of the same building for a similar purpose.
We do not think such a contention is tenable.' . . . It was
held that although there was no doubt that the games
played at the stadium had produced a use greatly in excess
of the former use, that intensification was not an extension
within the meaning of the Zoning Ordinance.

"We think that the present case is controlled by the princi-
ple of the Green case and that the court below was right in
striking down the restriction which the Board had placed on
the use of the open space in front of the garage, and in
affirming otherwise the findings of the Board."

205 Md. at 161–162, 106 A.2d at 488, *citing* and *quoting Green,*
192 Md. at 63, 63 A.2d at 330.

*Jahnigen v. Staley,* 245 Md. 130, 225 A.2d 277 (1967), is
similarly instructive. There, a decree by the Circuit Court for
Anne Arundel County, in addition to restrictions related to
and involving expansions of physical facilities, including the
extension of a pier, occurring after the zoning which prohibit-
ed any non-conforming use to those uses in effect prior to the
date of its adoption, 245 Md. at 133, 225 A.2d at 279, restricted
the nonconforming use of marina property to the rental of
seven rowboats. The waterfront property had been used by its
previous owners as a boat rental property dating from 1946,
when a pier was attached to the land, and continuing after
1949, when a comprehensive zoning ordinance rezoned the
land and placed the property into an agricultural classification.

On appeal, this Court reaffirmed the principle that
although the purpose of zoning regulations is to restrict rather
than to expand nonconforming uses, *Phillips v. Zoning Com-
missioner,* 225 Md. 102, 169 A.2d 410 (1961), an intensification
of a non-conforming use is permissible so long as the nature
and character of the use is unchanged and substantially the
same facilities are used. 245 Md. at 137, 225 A.2d at 281, *see
also Nyburg,* 205 Md. 150, 106 A.2d 483. While physical

expansions like constructing a new pier and use of the land for services other than what was already present prior to the effective date of the ordinance were held to be invalid extensions of the nonconforming use, 245 Md. at 138, 225 A.2d at 282, this Court decided that "[a]ny increase in the number of rowboats rented would be an intensification of [the] nonconforming use and would not be an extension." 245 Md. at 138, 225 A.2d at 282. The intensification of a non-conforming use, in short, is permissible so long as the nature and character of the use is unchanged and substantially the same facilities are used. 245 Md. at 137, 225 A.2d at 281.

To like effect is *Feldstein v. LaVale Zoning Board*, 246 Md. 204, 227 A.2d 731 (1967). In that case, the issue involved whether the expansion of a high rise junkyard owned by the appellant was an extension of a nonconforming use or an intensification of a nonconforming use. The junkyard, operating since 1939, was surrounded by property that was later rezoned for residential use. The junkyard was recognized as a nonconforming use; however, the zoning ordinance provided that "all presently existing junkyards must be screened within a year by the erection of a fence or wall or by the planting of trees, shrubbery or other planting." 246 Md. at 207–208, 227 A.2d at 732. The appellant had stacked scrap metal higher than it was able to be concealed. The zoning board alleged, on that basis, that the owner had unlawfully expanded the nonconforming use, and sought an order permanently enjoining the extension of the junkyard beyond the area occupied at the time the zoning ordinance was adopted. 246 Md. at 208, 227 A.2d at 732.

The chancellors who heard the cases [11] found that the stacking of junk was not an extension of the nonconforming use, in violation of the zoning ordinance; rather, it was, they concluded, an intensification of that use. 246 Md. at 209, 227 A.2d at 733. This Court agreed:

---

11. Two judges, Harold E. Naughton and James S. Getty, sat for this zoning case in the Circuit Court for Allegany County.

"The zoning ordinance ... provides that a nonconforming use shall not be extended, but that does not mean that the vested nonconforming use of the junkyard owner could not be lawfully intensified. The chancellors held that the increase in the quantity and height of the stored scrap metal was an intensification and not an extension under the law. We agree.... While a nonconforming use should not be extended or perpetrated longer than necessary, the more frequent present use of property for the same or a similar use than that for which it had been used less frequently theretofore was held to be an intensification and not an extension."

246 Md. at 211, 227 A.2d at 734, *citing Green,* 192 Md. 52, 63 A.2d 326; *Nyburg,* 205 Md. 150, 106 A.2d 483. *Jahnigen,* 245 Md. 130, 225 A.2d 277. *See also County Commissioners of Carroll County v. Zent,* 86 Md.App. 745, 587 A.2d 1205 (1991), in which the Court of Special Appeals, addressing a parcel of land in Carroll County, Maryland, that was zoned for agricultural use in 1965, but had had a milk delivery trucking business on its land since 1923, opined that an increase in the number of decommissioned delivery trucks stored for parts on property owned by the business would be an intensification of the nonconforming use for which it was using the property, not an illegal extension. 86 Md.App. at 757, 587 A.2d at 1211.

In these cases, we have consistently held that merely increasing the frequency of a nonconforming use did not constitute an unlawful extension; rather, it was but an intensification of the use. The Court of Special Appeals distinguishes these cases on the basis that none of them, with the exception of *Green,* dealt with the situation presented in this case:

"But none of these cases involved an expansion of the temporal limits of operation. Each concerned, at most, increasing the amount of business performed within an existing temporal framework-in other words, intensifying the use of the premises during existing business hours."

151 Md.App. at 179–80, 824 A.2d at 984–85.

To be sure, as the intermediate appellate court noted, the cases, with the exception of *Green,* do not address the situa-

tion *sub judice*. On the other hand, *Green* did not draw, expressly or otherwise, the distinction that the Court of Special Appeals draws; we did not, in *Green,* say, or signal in any way, that any increase in the nonconforming use, except temporally, by adding days or hours of operation, would be an intensification, but that the temporal modification would be an unlawful expansion of the use. We do not read the cases so narrowly. In each of the cases, the frequency of the use of the subject property in the nonconforming manner was increased, often significantly so, without regard to the hours of operation. Their focus was, as it should be, on the actual use made of the property, not the times when that use occurs.

If the intermediate appellate court is correct, *Green* is no longer good law and our definition of "intensification" is misleading, if not largely meaningless. Indeed, the concept of intensification would have no meaning at all in the nightclub context, or in any other where there are discrete hours of operation, such as retail. In *Feldstein,* we distinguished an "intensification" of a nonconforming use from an "extension" of such use, noting that the former is "the more frequent present use of property for the same or a similar use than that for which it had been used less frequently theretofore." 246 Md. at 211, 227 A.2d at 734. Increasing the number of nights on which adult entertainment is presented at Club Choices from two to five, for example, would fit within the definition of "intensification"—it would be a "more frequent present use of property for the same or a similar use than that for which it had been used less frequently theretofore." In fact, that was the rationale for *Green;* going from infrequent baseball games to their presentation for much of the year seems a similar, if not identical, scenario.

As we have seen, the Court of Special Appeals views *Green* as being "of little precedential value," 151 Md.App. at 180, 824 A.2d at 985, if not inapplicable. We have not overruled *Green,* we do not now do so. Moreover, we are not at all sure of the accuracy of the intermediate appellate court's observation with respect to the timing of the *Green* decision, "before the zoning administrative process was created," 151 Md.App. at 180, 824

A.2d at 983, with the result that "the deference owed an administrative body's interpretation of its governing statute and the substantial evidence rule played no role in the Court's decision." *Id.* The zoning ordinance was enacted in 1931 and we can assume that its implementation was entrusted to an administrative agency. The case did not proceed through the administrative process, however. It was an action for injunctive and declaratory relief. Therefore, the administrative agency was not called upon to, and, thus, did not opine on the subject. Had it done so, the deference due it would not have carried the day. The Court, in any event, would have been required to decide whether that conclusion of law, to which deference was due, was correct.

Nor are we persuaded by the out-of-state cases upon which the appellees and the Court of Special Appeals relied. *Garb–Ko v. Carrollton Township*, 86 Mich.App. 350, 272 N.W.2d 654 supports the proposition for which it is offered, the Court of Appeals of Michigan having answered in the affirmative the question, "whether the extension of hours of a grocery store operating as a nonconforming use constitutes an expansion of the nonconforming use which can be lawfully restricted by the defendant township." 86 Mich.App. at 352–353, 272 N.W.2d at 655. It did so, however, on the basis of the following Michigan policies: "that the continuation of a nonconforming use must be substantially of the same size and same essential nature as the use existing at the time of passage of a valid zoning ordinance" and that "[t]he policy of the law is against the extension or enlargement of nonconforming uses, and zoning regulations should be strictly construed with respect to expansion." *Id.* at 353, 272 N.W.2d at 655, *quoting Norton Shores v. Carr,* 81 Mich.App. 715, 720, 265 N.W.2d 802, 805 (1978); *Dearden v. Detroit,* 70 Mich.App. 163, 169, 245 N.W.2d 700, 703 (1976); *White Lake Township v. Lustig,* 10 Mich.App. 665, 674, 160 N.W.2d 353, 357 (1968). These policies would prohibit the distinction between intensification and expansion that is, and long has been, recognized in Maryland.

*Time–Low Corp. v. City of LaPorte Bd. of Zoning Appeals,* 547 N.E.2d 877 (Ind.Ct.App.1989) also is distinguishable from

the case *sub judice.* Time–Low purchased a plot of land on which there was a filling station and then applied for a building permit to convert the filling station to a convenience store and gas station. The LaPorte Board of Zoning Appeals issued the building permit, but limited the hours of operation of the convenience store. As relevant, LaPorte's Zoning Ordinance Code provided:

*"18.57.030 Change to other nonconforming use.*

"A. A nonconforming use may not be changed to any other nonconforming use without the permission of the board of zoning appeals regardless of whether or not structural changes are made or required to be made in the building or premises.

"B. A nonconforming use changed to a conforming use may not thereafter be changed back to any nonconforming use without the permission of the board of zoning appeals. (Prior code § 29–96)

*       *       *       *       *       *

*"18.57.060 Remodeling, addition to or alteration of existing use.*

"A lawful nonconforming use existing at the time of the passage of the ordinance codified in this title shall not be remodeled, added to or structurally altered without the permission of the board of zoning appeals. (Prior code § 29–99)"

The Court of Appeals of Indiana, Third District, agreed that the change in nonconforming use that the applicant sought required approval by the Board, and, thus, was subject to Board regulation. 547 N.E.2d at 879. In support of its conclusion, the court identified a list of physical changes, which it characterized as extensive and which it determined required Board approval. 547 N.E.2d at 879. Accordingly, it was in this context that the court stated:

"The Board of Zoning Appeals .... may use its judgment and discretion in making such modification of the [building commissioner's] order and attach such conditions and restrictions to the granting of a variance as in its opinion

should be made, so that the spirit of the ordinance shall be observed and substantial justice done."

547 N.E.2d at 880, *citing City of E. Chicago v. Sinclair Ref. Co.,* 232 Ind. 295, 313–314, 111 N.E.2d 459, 467 (1953).

The other two cases, *Incorporated Village v. Hillside Ave. Restaurant Corp.,* 55 A.D.2d 927, 390 N.Y.S.2d 637 (1977), and *Cornell Uniforms, Inc. v. Township of Abington,* 8 Pa. Cmwlth. 317, 301 A.2d 113, 116 (1973), are both distinguishable and unpersuasive. *Cornell Uniforms,* like *Time–Low,* involved temporal restrictions imposed in the wake of the substantial physical changes to the property that the applicant sought when changing its nonconforming use. In *Incorporated Village,* while the court upheld restrictions placed on the operating hours of an adult entertainment club, its rationale for doing so is, to say the least, sparse; the court provides little in the way of reasoning as to why it possessed the authority to temporally restrict the hours of the nonconforming use.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND TO REMAND THE CASE TO THAT COURT FOR ENTRY OF A JUDGMENT IN FAVOR OF THE PETITIONER. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.