912 A.2d 598

**Edward D. PURICH, et. al.**

v.

**DRAPER PROPERTIES, INC.**

**No. 9 Sept. Term, 2006.**

Court of Appeals of Maryland.

Dec. 7, 2006.

Harrell, J., filed a dissenting opinion joined by Raker and Greene, JJ.

David W. Brown (Knopf & Brown, on brief), Rockville, MD, for Appellants.

Stanley J. Reed (Harry W. Lerch, Steven A. Robins, and Stuart R. Barr of Lerch, Early & Brewer, Chtd., on brief), Bethesda, MD, for Appellee.

Argued Before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

CATHELL, Judge.

This case concerns the judicial review of a decision of the Montgomery County Board of Appeals (the "Board of Appeals" or "Board") addressing a dispute involving a piece of property upon which an automobile filling station is located (the "Property"). The filling station is located in the Cloverly neighborhood of Montgomery County. The appellants in this case, the Cloverly Civic Association and Dr. Edward D. Purich, an owner of property adjacent to the station, (herein collectively referred to as "Purich") contest the operation of

the automobile filling station under the Montgomery County Zoning Ordinance ("Zoning Ordinance"). The appellee, Draper Properties, Inc. ("DPI"), owns the property on which the automobile filling station in question is situated. The filling station has been in operation since some time in the early 1960's.[1] From early 1963 until 1997, the automobile filling station operated under the Zoning Ordinance as a lawful nonconforming use.[2] In 1997, DPI's lessee of the property, Shell Oil Co. ("Shell"), applied for a special exception[3] for its use of the Property as an automobile filling station and the special exception was granted.[4]

The automobile filling station was operated under the auspices of that special exception until July 11, 2003–even though it appears that none of the improvements attached as condi-

---

1. In 1962, the Montgomery County Council deemed it necessary to require special exceptions for the operation of automobile filling stations-effective May 1, 1963. Laws of Montgomery County 1963, Ordinance No. 4–166. While there is some question as to whether the DPI automobile filling station was in operation prior to the enactment of Ordinance No. 4–166, there is not enough evidence present in the record to establish conclusively one way or the other. Therefore, for argument's sake, we will assume that an automobile filling station operated on the property prior to the requirement for a special exception.

2. The Zoning Ordinance defines a nonconforming use as: "A use that was lawful when established and continues to be lawful, even though it no longer conforms to the requirements of the zone in which it is located because of the adoption or amendment of the zoning ordinance or the zoning map." § 59–A–2.1 of the Zoning Ordinance.

3. The Zoning Ordinance defines a special exception as: "The grant of a specific use that would not be appropriate generally or without restriction, which must be based on a finding that certain conditions governing special exceptions as detailed in Article 59–G exist, and that the use is consistent with the applicable master plan and is compatible with the existing neighborhood." § 59–A–2.1 of the Zoning Ordinance.

4. The record does not reflect whether DPI approved of, or even knew of the application. We have not been able to find in the Montgomery County Zoning Ordinance any requirement that an owner of property must themself apply for a special exception. An applicant must only be able to show that it has a legal right via a lease, rental agreement, or contract to purchase. § 59–A–4.22(a)(6) of the Zoning Ordinance.

tions to the special exception by the Board was made. At that time, pursuant to the request of DPI's new lessee, Petroleum Marketing Group, Inc. ("PMG"), the Board revoked the special exception and found that the lawful nonconforming use remained. On July 18, 2003, Purich objected to the Board via letter-arguing against the revocation of the special exception and seeking a hearing. The hearing was eventually held on December 1, 2004, at which time the Board voted against reconsideration of the issue. A written decision was issued by the Board on February 11, 2005.

Purich appealed the Board's decision to the Circuit Court for Montgomery County and a hearing was held on August 4, 2005. On August 8, 2005, an order was issued from that court affirming the Board's decision. Purich then timely appealed to the Court of Special Appeals. This Court, on its own initiative and prior to any proceedings in the intermediate appellate court, granted certiorari. *Purich v. Draper,* 393 Md. 160, 900 A.2d 206 (2006). Purich submits two questions for our consideration:

"1. In Montgomery County, when an applicant seeks and obtains a special exception of a particular type, and thereafter uses the subject land in the manner authorized by the grant of approval, can the special exception holder nevertheless simultaneously claim that the special exception has been abandoned?

2. In Montgomery County, may nonconforming use status be reestablished, even though the abandonment period prescribed by law has run while the use operates lawfully under a properly obtained special exception?"

We answer both questions in the negative. During the period between the time of the granting of a special exception and the time when a special exception is "revoked" for failure to meet all of the conditions, the Property was being operated pursuant to the special exception or it would have been improper for the owner or lessee to begin any of the improvements for which the applicant applied. In the case *sub judice,* the use granted by the special exception-an automobile filling

station-was immediately established, albeit the applicant may not have complied with all of the conditions even though the special exception was later revoked.[5]  Once the special exception was granted, the use became "permitted" and the nonconforming use terminated, or at least the six month period of abandonment on the nonconforming use of the property began to run.[6]  If not sooner terminated, the nonconforming use was thereafter abandoned when the Property was operated as a "permitted use" under the special exception for six months. Once that period elapsed the nonconforming use could not be reestablished.  § 59–G–4.14 of the Zoning Ordinance.

## I.  Facts

The automobile filling station in question is located at 15541 New Hampshire Avenue in Silver Spring, Maryland-a Convenience Commercial (C–1) zone.  DPI owns the Property and has been the owner for the entire period of time relevant to the issues at hand.  Sometime early in 1963, DPI leased the Property to Shell for the operation of the filling station.  Up until May 1, 1963, automobile filling stations were classified as permitted uses under the C–1 zone.  On May 1, 1963, however, pursuant to a change in the Zoning Ordinance, the operation of new automobile filling stations began to require a special exception.  *See supra,* footnote 1;  §§ 59–A–2.1 and 59–

---

5.  One of the purposes of the special exception provision in the context of the Montgomery County Zoning Ordinance was to provide a way for nonconforming uses to come into conformance and thus be permitted uses, by requiring certain upgrades in the operations.

6.  Normally, the abandonment of a nonconforming use would occur when all use of the Property ceased for six months and no other use was made of the Property.  In other words, if there had been a complete hiatus of use for six months, as almost happened between the time Shell ceased operations and PMG began to operate, the nonconforming use would be lost.  It is, at a minimum, unclear whether a nonconforming use is terminated *immediately* upon the change from a nonconforming use to a permitted use.  Because we are holding under these particular circumstances that a nonconforming use had ceased for the requisite six months provided for in the ordinance, it is not necessary to resolve the issue of immediate termination although it will be discussed to some degree, *infra.*

C–4.2 of the Zoning Ordinance. One of the effects of the new ordinance was that if an operator sought to upgrade its facility, it would have to apply for, and receive, a special exception to operate a filling station. The property at issue here continued to be operated as a filling station, but as a nonconforming use until 1997. §§ 59–A–2.1 and 59–G–4.1 of the Zoning Ordinance.

In 1997, Shell applied to the Board for a special exception. The petition, contained in the record, clearly states that the proposed special exception applied for was for a "use" as an "Automobile Filling Station." The attached "Statement of Justification" indicates that Shell simply "desire[d] to renovate the existing gas station." The Board's opinion states that the reason for the application for the special exception was, pursuant to § 59–G–2.06[7] of the Zoning Ordinance, "to permit

---

7. The Zoning Ordinance states, in pertinent part:

"(a) An automobile filling station may be permitted, upon a finding, in addition to findings required in division 59–G–1, that:
(1) The use will not constitute a nuisance because of noise, fumes, odors or physical activity in the location proposed.
(2) The use at the proposed location will not create a traffic hazard or traffic nuisance because of its location in relation to similar uses, necessity of turning movements in relation to its access to public roads or intersections, or its location in relation to other buildings or proposed buildings on or near the site and the traffic pattern from such buildings, or by reason of its location near a vehicular or pedestrian entrance or crossing to a public or private school, park, playground or hospital, or other public use or place of public assembly.
(3) The use at the proposed location will not adversely affect nor retard the logical development of the general neighborhood or of the industrial or commercial zone in which the station is proposed, considering service required, population, character, density and number of similar uses.
(b) In addition, the following requirements must be complied with:
(1) When such use abuts a residential zone or institutional premises not recommended for reclassification to commercial or industrial zone on an adopted master plan and is not effectively screened by a natural terrain feature, the use shall be screened by a solid wall or a substantial, sightly, solid fence, not less than 5 feet in height, together with a 3–foot planting strip on the outside of such wall or fence, planted in shrubs and evergreens. Location, maintenance, vehicle sight distance provisions and advertising pertaining to screening shall

modernization of [the] existing automobile filling station...."
On April 7, 1997, in Case No. S–2217, the Board granted the
special exception, stating:

> "With respect to the requested special exception for an
> automobile filling station, based on the testimony and exhib-
> its in the record the Board finds that the petition satisfies
> all the requirements of Section 59–G–2.06 of the Zoning
> Ordinance for an automobile filling station and the general
> requirements for special exceptions contained in Section 59–
> G–1.21 of the Ordinance."

The special exception provided that Shell could install new
pump islands, construct a new canopy, upgrade the landscap-
ing, install a new sign, renovate the exterior and service bay

---

be as provided for in article 59–E. Screening shall not be required on
street frontage.

(2) Product displays, parked vehicles and other obstructions which
adversely affect visibility at intersections or to station driveways are
prohibited.

(3) Lighting is not to reflect or cause glare into any residential zone.

(4) When such use occupies a corner lot, the ingress or egress
driveways shall be located at least 20 feet from the intersection of the
front and side street lines of the lot as defined in section 59–A–2.1,
and such driveways shall not exceed 30 feet in width; provided, that
in areas where no master plan of highways has been adopted, the
street line shall be considered to be at least 40 feet from the center
line of any abutting street or highway.

(5) Gasoline pumps or other service appliances shall be located on
the lot at least 10 feet behind the building line; and all service
storage or similar activities in connection with such use shall be
conducted entirely within the building. There shall be at least 20 feet
between driveways on each street, and all driveways shall be perpen-
dicular to the curb or street line.

(6) Light automobile repair work may be done at an automobile
filling station; provided, that no major repairs, spray paint operation
or body or fender repair is permitted.

(7) Vehicles shall not be parked so as to overhang the public right-of-
way.

(8) In a C–1 zone, an automobile, light truck and light trailer rental,
as defined in section 59–G–2.07, and in a C–2 zone, an automobile,
truck and trailer rental lot, as defined in section 59–G–2.09, may be
permitted as a part of the special exception, subject to the provisions
set forth for such uses in this section. In addition, a car wash with
up to 2 bays may be allowed as an accessory use as part of the special
exception." § 59–G–2.06 of the Zoning Ordinance.

areas of the station, add a handicap parking space, install a trash enclosure, and install new lighting, which may not have been permitted unless a "special exception" for an automobile filling station use was first obtained. Shell continued to operate the filling station as it had before obtaining the special exception. There is no evidence in the record that Shell implemented any of the upgrades contained in the grant of the special exception, but, upon the granting of the special exception, it had the authority to begin the upgrades. This is because it was no longer operating as a nonconforming use, but as a permitted special exception use.

On December 31, 2002, Shell's lease was due to expire. Shell had stopped selling gasoline on August 12, 2002. DPI then entered into a lease with PMG and it began selling gasoline on February 6, 2003. Both parties agree that this period from August 12, 2002, through February 6, 2003 (not quite six months), did not result in a "cessation of use" or abandonment of any nonconforming use—had one still existed at the time. § 59–G–4.14 of the Zoning Ordinance.[8]

On December 2, 2002, prior to leasing the Property from DPI, PMG sent a letter to the Montgomery County Department of Permitting Services (the "Department") requesting a determination as to whether the Property still maintained a nonconforming use status. PMG asserted that the improvements authorized by the special exception were never undertaken and, thus, pursuant to § 59–A–4.53(b)(2) of the Zoning Ordinance,[9] the special exception had lapsed and the Property had reverted to a nonconforming use status. PMG desired to

---

**8.** The Zoning Ordinance states: "If a nonconforming use is abandoned, it must not be reestablished. A nonconforming use is abandoned if the nonconforming use stops for at least 6 months." § 59–G–4.14 of the Zoning Ordinance.

**9.** "A special exception is not valid after 24 months if the use is not established or a building permit is not obtained and construction started within the period." § 59–A–4.53(b)(2) of the Zoning Ordinance. This language provides that the special exception becomes invalid, not that it is revoked as of its inception. During the 24 month period, the special exception is valid or work would not be able to be commenced under it.

add an additional multi-purpose pump dispenser to the filling station and erect a canopy over the dispensers as an "intensification" of the alleged nonconforming use.[10] On December 16, 2002, the Department responded by letter to PMG's counsel, finding that the special exception had expired and the use of the station reverted to the nonconforming status.[11] Additionally, the Department found that the nonconforming use of the Property was not abandoned and that the installation of the additional pump dispenser and construction of a canopy over the dispensers would be considered an intensification of the nonconforming use.

On February 7, 2003, PMG sent another letter, via fax, to the Department in order to confirm the nonconforming status of the Property. On that same date the Department sent a letter to the Board informing it of the Department's position that the special exception had lapsed and that the Property had reverted back to a nonconforming status. The letter

---

10. DPI references a June 4, 2004, decision by the Board (Case No. S–2199), referred to as the "River Road" case, where, similar to the case *sub judice*, the owner of an automobile filling station sought revocation of a special exception and reversion of the property to nonconforming use status. Board of Appeals of Montgomery County, Case No. S–2199, June 4, 2004. In that administrative agency decision reference was made to the fact that a new canopy and gas pumps had been installed on the subject property. The Board found those improvements to be an "intensification" of the nonconforming use, rather than something requiring a special exception. As far as we are aware the "River Road" case has not been the subject of any judicial proceedings, at least at the appellate level. We need not reach whether such improvements result in a valid intensification of a nonconforming use in the case *sub judice* because of our disposition.

11. No authority was proffered for this position taken by the Department (i.e., that uses can revert back to a "legal" nonconforming status). We know of no authority that recognizes that a nonconforming use continues when a property is operated as a permitted use (e.g., a special exception). Nor are we aware of any authority permitting that which has been abandoned (in this case not operated as a nonconforming use for six months) to later be determined to have been revived or not abandoned. If it was abandoned six months after the grant of the special exception it cannot be "un-abandoned." Additionally, if it was abandoned it cannot be revived because of the prohibition in this county (as in most, if not all, counties) against creating illegal nonconforming uses after the relevant legislation has been enacted.

requested that the Board revoke the special exception per § 59–G–1.3(d)(ii)(2) of the Zoning Ordinance.[12] On April 16, 2003, the Board met and found that, pursuant to § 59–A–4.53(b)(2) of the Zoning Ordinance, the special exception was never implemented. Therefore, effective July 11, 2003, the Board revoked the Property's special exception.[13]

Purich, by letter dated July 18, 2003, made a request to the Board for a public hearing "to decide whether it is appropriate to deny revoking the special exception." The Board received Purich's letter on July 23, 2003, and first considered the request for reconsideration on September 10, 2003. But, in order to allow Purich to serve all of the parties involved, the Board deferred action until November 12, 2003. At that time, the Board voted to suspend the July 11, 2003, resolution revoking the special exception, finding that Purich had presented new evidence that warranted consideration. A resolu-

---

12. The Zoning Ordinance states in pertinent part:

"(d) **Abandonment.** For the purposes of this section, 'abandoned' and 'property owner' are defined as follows:

. . .

(ii) **Property owner.** Any person or persons who, as of the date of the Board's notice, is recorded in the record of assessments of real property maintained by the Montgomery County Department of Finance as the party chargeable for the payment of taxes on any assessment upon the property.

. . .

(2) If the Department receives a written response from the special exception holder and the property owner acknowledges that the special exception has been abandoned, the Department must notify the Board of its findings, and the Board, upon receipt of such notice, must adopt and issue a written resolution finding the special exception to have been abandoned and ordering the special exception revoked."

§ 59–G–1.3(d)(ii)(2). This language uses the term "revoked" while other sections of the Zoning Ordinance use the phrase "is not valid."

13. DPI has asserted that the Board was not required to issue such a Resolution in order to revoke the special exception; that the exception expired (was no longer valid) as a matter of law pursuant to § 59–A–4.53(b)(2) of the Zoning Ordinance. Even if that were so, it would not revive the nonconforming use status. It would merely mean that the property would thereafter have to be operated as a permitted use under the present ordinance which presumably would prohibit the operation of a filling station.

tion was issued on November 21, 2003.[14] A new Board hearing on the matter of the revocation was scheduled for January 7, 2004.

DPI, in the interim, appealed the November 21, 2003, Board resolution to reconsider the revocation to the Circuit Court for Montgomery County (Civil Action No. 248301). The Circuit Court dismissed the appeal as interlocutory and remanded the case to the Board for a final determination of whether reconsideration should be granted. The January 7, 2004, hearing never took place, rather, a hearing was held by the Board on December 1, 2004.

Purich's reconsideration request before the Board consisted of a discussion of certain "threshold issues." As the Chair of the Board stated:

"As I recall, the last time we met we were going to gather again together for two issues. Should the Board have issued the resolution to revoke the special exception, or is it revoked by operation of law; and number two, can the Board force a special exception holder to accept the special exception. These are my recollection of the threshold issues the Board must decide before we consider the revocation."

After hearing argument, the Board orally voted to deny reconsideration. On February 11, 2005, the Board issued a written decision, in which it only addressed the question of whether the Board can require a special exception holder to accept a special exception it does not want. The Board stated:

"Because we find it dispositive, we shall address only our second issue. In this case, the special exception holder, [DPI], has clearly manifested its intent that it does not desire to proceed under, or make use of, the approved

---

14. The Board relied on the Board of Appeals' Rules of Procedure Rule 10.1.2, which states: "The Board may grant reconsideration only on evidence of changed circumstances, new evidence that could not reasonably have been presented at the original hearing, or if some mistake or misrepresentation was made at the original hearing that requires rehearing and reargument in order to be corrected."

special exception. It has done so by (a) failing to appeal the July 11, 2003 Resolution revoking the special exception, and (b) opposing [Purich's] request for reconsideration, to the extent that it sought (prematurely, as the Court determined) judicial review of the Board's decision to hear the request for reconsideration. In its arguments to the Board, [DPI] has clearly and unequivocally indicated that it considers the special exception to have been abandoned and has no intention to seek reinstatement or, even if reinstated, to make use of it.

"Under these circumstances, it is [DPI's] right to have the special exception revoked. As [Purich's] counsel has fairly pointed out, a special exception is an authorization to use land in a particular way, never a command to do so. A special exception must be requested and used. A special exception holder who manifests the intent not to use the special exception is deemed to have relinquished its authorization. That intent may be manifested in one of several ways, such as non-implementation, abandonment, or by express actions or words. While the Zoning Ordinance only expressly addresses the first two of these circumstances, we find that the third is necessarily implicit in the very nature of a special exception. Consequently, once [DPI] manifested its intent not to use the automobile filling station special exception, the issue of whether it had failed to implement the special exception became moot.

. . .

"Accordingly, we conclude that, because the special exception holder has consented to the revocation of the special exception of the property, the revocation must stand."

Board of Appeals for Montgomery County, Case No. S–2217, February 11, 2005. On February 18, 2005, Purich filed a motion for reconsideration of the decision with the Board. On March 9, 2005, the Board denied that motion.

On March 10, 2005, Purich filed a petition for judicial review in the Circuit Court for Montgomery County. The court heard argument on August 4, 2005. On August 8, 2005, the

court issued an order affirming the Board's February 11, 2005, decision to revoke the special exception.

Before continuing our discussion, it is necessary to point out what appears obvious to the Court, but apparently not to the parties. The determinative issue is: When a special exception is "revoked," is that particular property thereafter required to be operated only as a permitted use in that particular district, or does a prior nonconforming use again spring into life after not having been utilized for a number of years?

## II. Standard of Review

In *Alviani v. Dixon,* 365 Md. 95, 775 A.2d 1234 (2001), we discussed the standard of review of administrative agency decisions in the context of special exceptions:

"A proceeding on a special exception is subject to a full judicial review. *Mossburg v. Montgomery County,* 329 Md. 494, 506, 620 A.2d 886, 892 (1993). We examined the correct standard of judicial review in *White v. North,* 356 Md. 31, 44, 736 A.2d 1072, 1079–80 (1999), when we stated that:

In judicial review of zoning matters, including special exceptions and variances, 'the correct test to be applied is whether the issue before the administrative body is "fairly debatable," that is, whether its determination is based upon evidence from which reasonable persons could come to different conclusions.' *Sembly v. County Bd. of Appeals,* 269 Md. 177, 182, 304 A.2d 814, 818 (1973). *See also Board of County Comm'rs v. Holbrook,* 314 Md. 210, 216–17, 550 A.2d 664, 668 (1988); *Prince George's County v. Meininger,* 264 Md. 148, 151, 285 A.2d 649, 651 (1972); *Zengerle v. Board of County Comm'rs,* 262 Md. 1, 17, 276 A.2d 646, 654 (1971); *Gerachis v. Montgomery County Bd. of Appeals,* 261 Md. 153, 156, 274 A.2d 379, 381 (1971). For its conclusion to be fairly debatable, the administrative agency overseeing the variance decision must have 'substantial evidence' on the record supporting its decision. *See Mayor of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 395, 396 A.2d 1080, 1087 (1979); *Mont-*

*gomery County v. Woodward & Lothrop, Inc.,* 280 Md. 686, 706, 376 A.2d 483, 495 (1977), *cert. denied sub nom. Funger v. Montgomery County,* 434 U.S. 1067, 98 S.Ct. 1245, 55 L.Ed.2d 769 (1978); *Agneslane, Inc. v. Lucas,* 247 Md. 612, 619, 233 A.2d 757, 761 (1967).

In *Mayor of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 398, 396 A.2d 1080, 1089 (1979), we defined the substantial evidence test as ' "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached," *Insurance Comm'r v. Nat'l Bureau [of Cas. Underwriters]*, 248 Md. 292, 309, 236 A.2d 282 (1967), or as ' "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Bulluck v. Pelham Wood Apts.,* 283 Md. 505, 390 A.2d 1119 (1978); *Snowden v. Mayor & C.C. of Balto., supra,* 224 Md. [443] at 448, 168 A.2d 390.' In applying the substantial evidence test:

> The question for the reviewing court is ... whether the conclusions 'reasonably may be based upon the facts proven.' The court may not substitute its judgment on the question whether the inference drawn is the right one or whether a different inference would be better supported. The test is reasonableness, not rightness.

*Annapolis Waterfront Co.,* 284 Md. at 399, 396 A.2d at 1089, quoting 4 K. Davis, *Administrative Law,* § 29.05, 137, 139 (1958).

"When we review an administrative agency's order, we make sure that it is not premised upon an error in the law. *Ad + Soil, Inc. v. County Commissioners of Queen Anne's County,* 307 Md. 307, 338, 513 A.2d 893, 909 (1986). 'Generally, a decision of an administrative agency, including a local zoning board, is owed no deference when its conclusions are based upon an error of law.' *Belvoir Farms Homeowners Association, Inc. v. North,* 355 Md. 259, 267, 734 A.2d 227, 232 (1999), citing *Catonsville Nursing Home, Inc. v. Loveman,* 349 Md. 560, 569, 709 A.2d 749, 753 (1998)."

*Alviani*, 365 Md. at 107–09, 775 A.2d at 1241–42; *see also Department of Natural Resources v. Heller*, 391 Md. 148, 892 A.2d 497 (2006); *Motor Vehicle Administration v. Weller*, 390 Md. 115, 887 A.2d 1042 (2005). The Board's decision in this case was premised upon an erroneous conclusion of law.

## III. Discussion

██ The central issue in the case *sub judice* concerns an interpretation of the law of nonconforming uses. The law is well established that a nonconforming use exists if a person utilizes property in a certain manner that is lawful before and up to the time of the adoption of a zoning ordinance, though the then-adopted zoning ordinance may make that previously lawful use non-permitted. *Bd. of Zoning Appeals of Howard County v. Meyer*, 207 Md. 389, 394, 114 A.2d 626, 628 (1955); *Amereihn v. Kotras*, 194 Md. 591, 601, 71 A.2d 865, 869 (1950); *Antwerpen v. Baltimore County*, 163 Md.App. 194, 201, 877 A.2d 1166, 1170 (2005); *Mayor and City Council of Baltimore v. Dembo, Inc.*, 123 Md.App. 527, 531, 719 A.2d 1007, 1010 (1998); *Lone v. Montgomery County*, 85 Md.App. 477, 496, 584 A.2d 142, 151 (1991); 1 Kenneth H. Young, *Anderson's American Law of Zoning* § 6.01 (4th ed. 1996, unchanged through 2006 Supp.) ("A use which lawfully existed prior to the enactment of a zoning ordinance, and which is maintained after the effective date of the ordinance, although it does not comply with the zoning restrictions applicable to the district in which it is situated, is commonly referred to as a 'nonconforming use.' "). As Judge Grason, writing for the Court, cogently expressed in *Amereihn:*

"If a property is used for a factory, and thereafter the neighborhood in which it is located is zoned residential, if such regulations applied to the factory it would cease to exist, and the zoning regulation would have the effect of confiscating such property and destroying a vested right therein of the owner. Manifestly this cannot be done, because it would amount to a confiscation of the property,

and nonconforming use is a vested right and entitled to constitutional protection."

194 Md. at 601, 71 A.2d at 869 (see authority cited).

This Court further discussed nonconforming uses in *Beyer v. Mayor and City Council*, 182 Md. 444, 34 A.2d 765 (1943), in which Judge Marbury, writing for the Court, stated:

"Non-conforming uses have been before this court in several cases. They are common to all zoning statutes or ordinances and are those permitted by such statutes or ordinances to continue even though similar uses are not permitted in the area in which they are located. The reason for this is stated in the leading work on the subject: 'The view that has been followed is that a few non-conforming buildings and uses if allowed to continue will not be a substantial injury to a community if only such non-conforming buildings are not allowed to multiply where they are harmful or improper. Zoning has sought to safeguard the future, in the expectation that time will repair the mistakes of the past.' *Bassett on Zoning*, Chap. V, p. 105."

*Beyer*, 182 Md. at 446, 34 A.2d at 766.

We further explained the theory of nonconforming use and its place in zoning law in *County Council of Prince George's County v. E.L. Gardner, Inc.*, 293 Md. 259, 443 A.2d 114 (1982). In *Gardner*, the question was "whether, under the applicable provisions of the Prince George's County Code ..., the owner of a nonconforming surface mining sand and gravel operation [could] obtain a special exception to operate a sand and gravel wet-processing facility at the same location." 293 Md. at 261, 443 A.2d at 115. The Court answered the question by holding that the addition of a sand and gravel wet-processing facility would change the use of the property and, under the applicable local ordinances, such a change in use was explicitly prohibited. *Id.* at 269, 443 A.2d at 119. Discussing zoning in general, the Court stated: "One of the basic tenets of zoning is that some uses of land are incompatible with others, and that more efficient employment of land resources is achieved if such incompatible uses are separated."

*Id.* at 266, 443 A.2d at 118. In an attempt to create homogeneous land use, zoning ordinances have been established on a county by county and city by city basis. Local zoning ordinances, however, "unavoidably include land devoted to uses proscribed by the zoning regulations. Such nonconforming uses pose a formidable threat to the success of zoning. They limit the effectiveness of land use controls, contribute to urban blight, imperil the success of the community plan, and injure property values." *Id.* at 267, 443 A.2d at 118 (citing 1 R.M. Anderson, *American Law of Zoning* § 602 (2d ed. 1976)).

The *Gardner* Court found that "[t]his Court has repeatedly recognized that one of the fundamental problems of zoning is the inability to eliminate incompatible nonconforming land uses[,]" 293 Md. at 267, 443 A.2d at 118, and quoted *Grant v. Mayor and City Council of Baltimore*, 212 Md. 301, 129 A.2d 363 (1957) in support:

> "Nonconforming uses have been a problem since the inception of zoning. Originally they were not regarded as serious handicaps to its effective operation; it was felt they would be few and likely to be eliminated by the passage of time and restrictions on their expansion. For these reasons and because it was thought that to require immediate cessation would be harsh and unreasonable, a deprivation of rights in property out of proportion to the public benefits to be obtained and, so, unconstitutional, and finally a red flag to property owners at a time when strong opposition might have jeopardized the chance of any zoning, most, if not all, zoning ordinances provided that lawful uses existing on the effective date of the law could continue although such uses could not thereafter be begun. *Nevertheless, the earnest aim and ultimate purpose of zoning was and is to reduce nonconformance to conformance as speedily as possible with due regard to the legitimate interests of all concerned, and the ordinances forbid or limit expansion of nonconforming uses and forfeit the right to them upon abandonment of the use* or the destruction of the improvements housing the use."

*Grant,* 212 Md. at 307, 129 A.2d at 365 (emphasis added). The *Gardner* Court continued:

> "Thus, this Court has recognized that the problem inherent in accommodating existing vested rights in incompatible land uses with the future planned development of a community is ordinarily resolved, under local ordinances, by permitting existing uses to continue as nonconforming uses subject to various limitations upon the right to change, expand, alter, repair, restore, or recommence after abandonment. Moreover, this Court has further recognized that the purpose of such restrictions is to achieve the ultimate elimination of nonconforming uses through economic attrition and physical obsolescence. *The Arundel Corp. v. Board of Zoning Appeals of Howard County,* 255 Md. 78, 83–4, 257 A.2d 142, 146 (1969); *Stieff v. Collins,* 237 Md. 601, 604, 207 A.2d 489, 491 (1965); *Colati v. Jirout,* 186 Md. 652, 655, 657, 47 A.2d 613, 614–15 (1946); *Beyer v. Mayor of Baltimore,* 182 Md. 444, 446, 34 A.2d 765, 766 (1943); *See Kastendike v. Baltimore Ass'n for Retarded Children, Inc.,* 267 Md. 389, 397, 297 A.2d 745, 749–50 (1972)." [15]

*Gardner,* 293 Md. at 268, 443 A.2d at 119.

### A.

■ DPI contends that the Property was in use as an automobile filling station as a lawful nonconforming use. DPI asserts that the application by its lessee Shell in 1997 for a special exception, and its subsequent granting and then possible revocation, do not disturb the nonconforming use status of the Property. In opposition, Purich argues that, though the

---

**15.** None of the cases referred to in the supporting strip cite offer any support for the term "recommence after abandonment." The cases cited concern instances where a different, less onerous nonconforming use is authorized by statute and is substituted, or concerns the legalization of terminated uses via the variance process. We are unaware whether variances have been, or could be, sought in the instant case or whether the proceedings to "revive" the nonconforming use were in the nature of variance requests. The issue of variances was not presented to this Court. On remand the issue may arise before the Board. We do not address it here.

Property may have been operated as a nonconforming use prior to 1997, once the special exception was obtained and utilized for six months, the nonconforming use was abandoned- thus it was eliminated. Thereafter, the Property, if operated as an automobile filling station, could only be operated as a special exception. We find that, in the case *sub judice*, the nonconforming use status, if not earlier terminated, was abandoned after the special exception was granted and six months elapsed. We explain below.

■ First, we look to the Montgomery County Zoning Ordinance in analyzing the status of the Property's nonconforming use. It is important for our analysis to note that the applicable Zoning Ordinance provisions must be strictly construed. *Gardner*, 293 Md. at 268, 443 A.2d at 119 ("These local ordinances and regulations must be strictly construed in order to effectuate the purpose of eliminating nonconforming uses.") (citing *City of Hagerstown v. Wood*, 257 Md. 558, 563, 263 A.2d 532, 534 (1970); *Hewitt v. County Comm'rs of Baltimore County*, 220 Md. 48, 59, 151 A.2d 144, 150 (1959); *Mayor of Baltimore v. Byrd*, 191 Md. 632, 638, 62 A.2d 588, 591 (1948); *Colati*, 186 Md. at 658–59, 47 A.2d at 616; *Knox v. Mayor of Baltimore*, 180 Md. 88, 96, 23 A.2d 15, 18 (1941)).

The filling station was presumably in operation as a lawful nonconforming use, as defined by § 59–A–2.1 of the Zoning Ordinance, prior to the granting of the special exception applied for by Shell in 1997. Special exceptions are defined as:

"The grant of a specific use that would not be appropriate generally or without restriction, which must be based on a finding that certain conditions governing special exceptions as detailed in Article 59–G exist, and that the use is consistent with the applicable master plan and is compatible with the existing neighborhood."

§ 59–A–2.1 of the Zoning Ordinance. We said in *Stacy v. Montgomery County*, 239 Md. 189, 193, 210 A.2d 540, 542 (1965): "A special exception within the meaning of the zoning ordinance is one which is controlled and which is expressly

permissible in a given zone." Thus, when one applies for and is granted a special exception for a use being made, or to be made, that use becomes a permitted use even if it had theretofore been a nonconforming use. This reclassification normally carries with it several advantages, such as being able to, as a matter of right, recommence or replace the use after its destruction by fire or other disaster. The special exception for an automobile filling station is delineated in § 59–G–2.06 of the Zoning Ordinance. That section is entitled "Automobile filling stations" and states that "[a]n automobile filling station may be permitted ..." upon meeting several requirements. § 59–G–2.06. The special exception was granted by the Board to Shell on April 7, 1997. At that point, under our cases, the use became a permitted use for the operation of the filling station. Thus, it was no longer a nonconforming use.

DPI contends that the special exception was for the "modernization" of an existing automobile filling station operated as a lawful nonconforming use. Purich contends that special exceptions cannot be issued simply for modernization. In resolving this conflict we look to the Zoning Ordinance. The only provision in the Zoning Ordinance that references automobile filling stations-in regard to special exceptions-is § 59–G–2.06, and it does not mention modernization; it only refers to the operation of a filling station in general. The Zoning Ordinance, in fact, does not mention modernization in regard to special exceptions at all.[16] Much of the confusion surrounding this issue stems from the Board's April 7, 1997, opinion, where it stated: "Case No. S–2217 is the petition of Shell Oil Company, for a special exception, pursuant to Section 59–[G]–2.06 (Automobile Filling Station) of the Zoning Ordinance to permit *modernization* of an existing automobile filling station

---

**16.** The only reference to "modernization" that we have found in the Zoning Ordinance is in § 59–C–18.17, entitled "Chevy Chase neighborhood retail preservation overlay zone." The section states that the purpose of the overlay zone is to: "Retain the existing mix of neighborhood-oriented retail and service uses while allowing a reasonable expansion and *modernization* of retail space...." § 59–C–18.171(a) of the Zoning Ordinance (emphasis added). This provision is not related to special exceptions.

and variances as described below." Board of Appeals for Montgomery County, Case No. S–2217 & A–4485, April 7, 1997 (emphasis added). This is a statement that the reason the applicant wanted the special exception was that under such exception, if it was granted, Shell could modernize the facility. The special exception use was, however, not *for* modernization, but for the automobile filling station *use* itself. Unfortunately, the Board's initial characterization of the special exception for the Property was misleading and has apparently subsequently misled the Board and the trial court. Additionally, it is clear from Shell's actual petition, that the "Use proposed" by it, and consequently DPI, was an "Automobile Filling Station," not just the modernization.

In Montgomery County, special exceptions are the "grant of a specific *use* that would not be appropriate generally or without restriction. . . ." § 59–A–2.1 of the Zoning Ordinance (emphasis added). The Zoning Ordinance defines "Use" as: "Except as otherwise provided, the principal purpose for which a lot or the main building thereon is designed, arranged, or intended, and for which it is or may be used, occupied, or maintained." § 59–A–2.1. It is evident from the Zoning Ordinance that the special exception for an automobile filling station is only for that particular use. Special exceptions, pursuant to portions of the Zoning Ordinance applicable here, are for *uses*, not modernization-although a desire to be permitted to modernize may be the reason an applicant applies for a special exception, i.e., a special exception may permit modernization where it would not be permitted if the filling station was operating as a nonconforming use.

A special exception brings a property into conformance with applicable zoning laws. The use becomes permitted, albeit there may be conditions. In this case, the nonconforming use of the Property as an automobile filling station prior to April 7, 1997, though lawful, was in conflict with Montgomery County's zoning goals. Once the special exception was granted on April 7, 1997, the use of the Property came into conformance with the zoning law; hence, the nonconforming

use ceased. Subject to § 59–G–4.14 of the Zoning Ordinance, "[a] nonconforming use is abandoned if the nonconforming use stops for at least 6 months." In addition, "[i]f a nonconforming use is abandoned, it *must not be reestablished.*" § 59–G–4.14 (emphasis added).[17] The nonconforming use stopped on

---

**17.** Chief Judge Bell, writing for the Court, recently discussed abandonment in *Trip Associates, Inc. v. Mayor and City Council of Baltimore,* 392 Md. 563, 898 A.2d 449 (2006), stating:

"Abandonment ... focuses not on the owner's intent, but rather, on whether the owner failed to use the property as a nonconforming use in the time period specified in the zoning ordinance. *See Catonsville Nursing Home, Inc. v. Loveman,* 349 Md. 560, 581, 709 A.2d 749, 759 (1998) ('There is no hard and fast rule in nonconforming use abandonments that intent to abandon must be actually shown when the zoning ordinance or statute utilizes the word "abandonment." ')."

*Trip,* 392 Md. at 577, 898 A.2d at 457–58. The Court continued, however, stating that, "[o]n the other hand, the abandonment or discontinuance must be active and actual." *Id.* at 577, 898 A.2d at 458. Discussing this, the Court cited to *Mayor and City Council of Baltimore v. Dembo, Inc.,* 123 Md.App. 527, 719 A.2d 1007 (1998). In that case an adult night club had been operating without a proper license for two years. The question became, whether the failure to obtain the license operated to abandon the otherwise lawful nonconforming use. The court stated:

"We shall follow the majority of jurisdictions and apply the rule that a valid nonconforming use will not be forfeited by the failure of the business owner to secure a license to operate his business. We consider that this rule accords reasonable protection to the property right that has been long recognized under Maryland law as a vested right subject to constitutional protection."

*Dembo,* 123 Md.App. at 541, 719 A.2d at 1015. The situation in *Dembo,* however, is distinguishable from the case *sub judice.* DPI's lessee, Shell, took an affirmative action to apply for the special exception. That affirmative act is distinctive from the passive lack of action by the club owner in *Dembo.*

This is further supported by the Court's analysis of a predecessor to § 59–G–4.14 of the Zoning Ordinance, § 111–57(c) of the 1965 Code. The Court in *Canada's Tavern, Inc. v. Town of Glen Echo,* 260 Md. 206, 271 A.2d 664 (1970), stated:

"We think the Council, having in mind a larger purpose, intended to align itself with those local governments which have found it desirable to delete the factor of intent in respect of the abandonment, discontinuance or cessation of nonconforming uses rather than continuing to run the gamut of its judicial determination in a succession of infinitely variable factual situations."

260 Md. at 211, 271 A.2d at 666 (footnote omitted). Montgomery County has made it explicitly clear in § 59–G–4.14 of the Zoning Ordinance that: "If a nonconforming use is abandoned, it must not be

April 7, 1997, and the Property was operated under the special exception from that point forward. Thereafter, the six month period by which abandonment is calculated under the statute, if even applicable, began immediately upon the grant of, and operation under, the special exception.[18] Once Shell applied for and was granted a special exception for the operation of the filling station on the Property, it began to conform with the overall zoning provisions. Nonconformance became conformance and, pursuant to *Gardner* and *Grant,* the Zoning Ordinance must be strictly construed to eliminate the nonconforming use.

The special exception was for an automobile filling station, and the Property operated as just that both prior to and after April 7, 1997. It is clear from the record that DPI did not reestablish, or even attempt to reestablish, the nonconforming use within six months of April 7, 1997. The first attempt was on December 2, 2002, when PMG, a lessee of the Property, sent a letter to the Montgomery County Department of Permitting seeking a determination that the Property was still operating as a nonconforming use. The determination of the Department at that time-finding a continuing nonconforming use-was erroneous because the nonconforming use, if not earlier terminated upon the granting of the special exception, was abandoned and, once abandoned, *must not be reestablished.* § 59–G–4.14 of the Zoning Ordinance.

██ This result is in harmony with the policy of eliminating nonconforming uses. We stated in *Beyer:*

> "[T]he mere cessation of the use for a reasonable period does not of itself work an abandonment, but once the abandonment is clearly indicated by intention and action, or failure of action for a sufficient period of time, then the owner has lost his right to the non-conforming use, and

---

reestablished. *A nonconforming use is abandoned if the nonconforming use stops for at least 6 months.*" (Emphasis added).

**18.** Abandonment, as a concept, generally relates to the complete cessation of the use itself for the period, not to when the nonconforming use becomes a permitted use.

must use his property only in conformity with the uses allowed to other properties in the neighborhood. Were the law otherwise an owner could keep his property in a nonconforming class forever, which would be entirely contrary to the policy underlying zoning acts."

182 Md. at 454, 34 A.2d at 769; *Landay v. MacWilliams,* 173 Md. 460, 196 A. 293 (1938). DPI and Shell abandoned the operation of the filling station as a nonconforming use when Shell sought and obtained the special exception for the operation of the filling station. A property cannot operate where the use is both a nonconforming use and a special exception use *when it is the same use* because the permitted use extinguishes the nonconforming character of the use. The law requires that the conforming, permitted, use be favored, i.e., the special exception.

DPI argues that the special exception was never implemented and, therefore, that the nonconforming use of the Property never actually ceased. DPI cites to *Pemberton v. Montgomery County,* 275 Md. 363, 340 A.2d 240 (1975) in discussing "the factors that constitute actual implementation of a special exception." While it did not involve a pre-existing nonconforming use, *Pemberton* concerned another automobile filling station in Montgomery County. A party sought to build a *new* filling station and obtained a special exception for the use. The Court quoted from the zoning regulation in effect at the time, Montgomery County Code (1955) § 111–32(c)–a predecessor to the current Zoning Ordinance-which stated:

"A decision of the board or the director permitting the erection or alteration of a building shall be valid for a period of twelve months, during which time a building permit for such erection or alteration must be obtained and the erection or alteration started. No decision of the board permitting the use of a building or land shall be valid for a period longer than twelve months, unless such use is established within such period...."

*Pemberton,* 275 Md. at 366, 340 A.2d at 242. In that case, a citizen, Mrs. Pemberton, opposed the construction of the

filling station and claimed that Exxon, the special exception holder, had failed to implement the special exception. The Court affirmed the Board's finding that the special exception had been implemented by Exxon through its obtaining a building permit and beginning construction within the required twelve month period. DPI argues that "in contrast to the special exception holder in *Pemberton,* neither Shell nor [DPI] sought a building permit, initiated construction, or implemented any of the conditions of the special exception within the requisite twenty four (24) months." This argument, however, does not have merit when applied to the situation at hand. Here, a filling station already existed and was being operated and continued to be operated. The pertinent question is whether the legal status of its use changed upon the initial granting of the special exception.

The Zoning Ordinance provides in § 59–A–4.53(b)(2) that, in general, "[a] special exception is not valid after 24 months if the *use* is not established or a building permit is not obtained and construction started within the period." (Emphasis added). This language, when applied to property which at the time of an application for a special exception is already being operated as a "permitted" use (as opposed to a nonconforming use) is relatively clear. In such a case, if the rights granted under the special exception are lost, the property can be used as it was before because uses "permitted" by right under such an ordinance are never abandoned. The right to use property as "permitted" by the ordinance always remains. This language, however, when considered in the context of a special exception which changes a prior nonconforming use to a permitted use, is somewhat confusing. The change to a permitted use (i.e., the special exception) terminates the nonconforming use, which then cannot be revived or renewed. There is nothing to revive and nothing to renew. DPI contends that none of the steps toward modernization-as provided for in the grant of special exception-were taken, and thus the special exception is not valid.[19] There is little evidence in the

---

**19.** Purich asserts in its brief that Shell took some steps to fulfill the conditions of the special exception. There was, however, no evidentia-

record showing that all of the requirements of the special exception were met. That, however, is not entirely dispositive in the case *sub judice*. As discussed *supra*, the use's legal status as a permitted use was established the moment the special exception was granted because the filling station was, in fact, already operating.

DPI's argument hinges on the *modernization* being the operative scope of the special exception.[20] We hold, however, that the *use* is what defines a special exception in Montgomery County. § 59–A–2.1 of the Zoning Ordinance (defining "Special Exception" as "[t]he grant of a specific *use* . . . ." (emphasis added)). Therefore, whether DPI or Shell actually did or did not take any steps to modernize the Property is not dispositive to the establishment of the special exception for an automobile filling station. §§ 59–A–2.1 and § 59–A–4.53(b)(2) of the Zoning Ordinance. What is dispositive is that the Property was operating as an automobile filling station while a special exception permitting the operation of a filling station existed. That operation constitutes the *use* under the special exception. It was at that point a permitted use, albeit it might have been operating in violation of the Zoning Ordinance's requirements for such use.

---

ry fact-finding in the proceedings below. The Board's proceedings were limited to discussing the "threshold issue" of whether the Board could reconsider the revocation decision concerning the special exception itself. Because DPI did not challenge the revocation and stated that it did not intend to use the special exception, the Board found that the issue of whether it failed to implement the special exception became moot. Board of Appeals for Montgomery County, Case No. S–2217, February 11, 2005.

**20.** As stated *supra*, the actual original petition for the special exception was made by DPI's lessee at the time, Shell. In the petition, Shell indicated that the proposed use for the special exception was: "Automobile Filling Station." Shell did not mention "modernization." Shell simply indicated in the "Statement of Justification," which was attached to the petition, that it "desire[d] to renovate the existing gas station." Shell applied for the special exception because it could not make the renovations it desired while operating the filling station as a nonconforming use. It is clear that the operative scope of the special exception is the use (e.g., an automobile filling station), which Shell, and correspondingly DPI, recognized in its original petition.

To reiterate, the Board's February 11, 2005, Resolution only addressed one question, which the Board found determinative in the case: "Can the Board require a special exception holder to accept a special exception it does not want?" As we discussed *supra*, the Board stated:

"In this case, the special exception holder, [DPI], has clearly manifested its intent that it does not desire to proceed under, or make use of, the approved special exception. It has done so by (a) failing to appeal the July 11, 2003 Resolution revoking the special exception, and (b) opposing [Purich's] request for reconsideration, to the extent that it sought (prematurely, as the Court determined) judicial review of the Board's decision to hear the request for reconsideration. In its arguments to the Board, [DPI] has clearly and unequivocally indicated that it considers the special exception to have been abandoned and has no intention to seek reinstatement or, even if reinstated, to make use of it.

"Under these circumstances, it is [DPI's] right to have the special exception revoked. As [Purich's] counsel has fairly pointed out, a special exception is an authorization to use land in a particular way, never a command to do so. A special exception must be requested and used. A special exception holder who manifests the intent not to use the special exception is deemed to have relinquished its authorization. That intent may be manifested in one of several ways, such as non-implementation, abandonment, or by express actions or words. While the Zoning Ordinance only expressly addresses the first two of these circumstances, we find that the third is necessarily implicit in the very nature of a special exception. Consequently, once [DPI] manifested its intent not to use the automobile filling station special exception, the issue of whether it had failed to implement the special exception became moot.

. . .

"Accordingly, we conclude that, because the special exception holder has consented to the revocation of the special exception of the property, the revocation must stand."

Board of Appeals for Montgomery County, Case No. S–2217, February 11, 2005.

On August 8, 2005, the Circuit Court issued an order affirming the decision of the Board. The Circuit Court's finding was premised upon the special exception being issued for modernization rather than for the use as an automobile filling station. As discussed *supra*, that is not the correct interpretation. Therefore, the Circuit Court was incorrect in affirming the Board's decision.

In any case, the Board's decision did not properly address the issues now before the Court. The Board misconstrued the function of the granting of a special exception and, because of that, misconstrued when a special exception begins to exist. The situation extant is that once a special exception is applied for, granted, and operation of the subject property is begun or continued pursuant to it, the owner of the property has six months to revert back to a prior nonconforming use (if one existed) before it is abandoned. But in this case the special exception was not "revoked" within that six month period. Even if DPI could decide not to make use of that special exception and could pursue the revocation of the special exception, the result, however, would be that the Property could then only be operated pursuant to Montgomery County's Convenience Commercial (C–1) requirements. Thus, as the nonconforming use no longer exists, the Property can be operated as an automobile filling station only pursuant to a special exception-if it still exists. If the special exception was properly revoked then the only uses that may be made of the property are those uses permitted by right in the District.

Because of our holding, there is an issue remaining as to whether the special exception was, in fact, properly revoked[21]

---

**21.** One remedy for violating conditions attached to special exceptions might be a revocation of occupancy permits, revocation of business licenses, etc., and subsequent actions in court to enjoin the operations because of a failure to comply with conditions. Other than the present case and present jurisdiction, we are unaware of any other reported cases (and we have been made aware of none) in which special exceptions have been utilized to bring a property into conformance,

given that the Board and DPI mistakenly believed that they were returning the Property to its nonconforming status. As we cannot make that determination on the basis of the record before us, we shall remand to the Circuit Court for it to remand the issue to the Board for its reconsideration of the issue of whether the revocation of the special exception was properly accomplished.

## IV. Conclusion

In vacating the decision of the Circuit Court for Montgomery County, we find that the Circuit Court's and the Board's decision were based upon an erroneous conclusion of law. Special exceptions in Montgomery County are provided for *uses* of property. In the case *sub judice*, the Property was in operation as an automobile filling station pursuant to a special exception. Once that use began, either the nonconforming use was immediately terminated or, at a minimum, the six month period of abandonment started in respect to the prior nonconforming use status of the Property. Those six months passed and the nonconforming use, if not sooner terminated, was thus abandoned. For the reasons stated herein, we vacate the judgment of the Circuit Court for Montgomery County and remand the case to that court for it to remand the case to the Board for a re-determination of the status of the special exception.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY VACATED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE CASE TO THE BOARD OF APPEALS FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEES.**

Dissenting Opinion by HARRELL, J., which RAKER and GREENE, JJ., Join.

---

then been revoked years later with the prior nonconforming use automatically rising from the dead.

HARRELL, Judge, dissenting, joined by RAKER and GREENE, JJ.

I dissent. It is my view that, on the facts of this case, the Majority opinion improperly resolves the tension existing between a nonconforming use as a disfavored aspect of land use regulation, yet one that enjoys protection as a vested right. The Majority, in what I consider to be an opportunistic rush to declare extinguished the nonconforming use in the present case, imagines an intent to abandon the safe harbor of the nonconforming automobile filling and service station use simply because a prior tenant applied for and received paper approval of a special exception for a proposed conforming automobile filling station operation on the property in question. The Majority then misapprehends the significance of the utter failure of the tenant or property owner to take any affirmative act, subsequent to and in reliance on that paper special exception approval, to change or modify the nonconforming use into one conforming to the special exception and applicable zoning regulations.

There was neither abandonment nor termination of the nonconforming use here. The record is devoid of any evidence (substantial or otherwise) that the nonconforming automobile filling and service station use changed even by one whit since its establishment in the early 1960's and running through the closure of the evidentiary record in this case. Viewed in criminal law vernacular and even in a light most favorable to the Majority's view, the record at best reveals an intent to change (i.e., the obtention of the paper special exception approval) that might supply, had the Board of Appeals chosen to interpret it so, the *mens rea* of abandonment or termination, but which does not come close to satisfying the *actus reus* required before a declaration may be made of abandonment or termination of the constitutionally protected vested right to maintain and continue the nonconforming use.

A lawful nonconforming use includes generally a vested right to its continuance. *Trip Assoc. v. Mayor & City Council of Baltimore*, 392 Md. 563, 574, 898 A.2d 449, 456 (2006);

*County Comm'rs of Carroll County v. Uhler,* 78 Md.App. 140, 148, 552 A.2d 942, 945–46 (1989). As part of that vested right, the property owner is entitled to maintain that use, subject only to local ordinance limitations on expansion, abandonment, amortization, and the like. *County Council of Prince George's County v. E.L. Gardner, Inc.,* 293 Md. 259, 268, 443 A.2d 114, 119 (1982). Local ordinances regulating nonconforming uses generally seek to achieve the desired goal of the elimination of nonconforming uses through economic attrition and physical obsolescence. *Id.*

Abandonment or termination of a nonconforming use in modern land use regulation usually does not turn on the showing of mere intent to abandon the use. Compare *Trip Assoc.,* 392 Md. at 577, 898 A.2d at 457–58, and *Mayor & City Council of Baltimore v. Dembo,* 123 Md.App. 527, 539, 719 A.2d 1007, 1013–14 (1998) (citing *Catonsville Nursing Home, Inc. v. Loveman,* 349 Md. 560, 581–82, 709 A.2d 749, 759 (1998)), with *Landay v. Bd. of Zoning Appeals,* 173 Md. 460, 469, 196 A. 293, 297 (1938). Usually, it is the actual conduct of the user in ceasing the use for some statutory period that is determinative. *Trip Assoc., id.; Canada's Tavern, Inc. v. Town of Glen Echo,* 260 Md. 206, 210–11, 271 A.2d 664, 666 (1970). As this Court said in *Trip Associates,* a sufficient predicate to conclude "abandonment or discontinuance must be active and actual." *Id.* Indeed, the Montgomery County Zoning Ordinance governing abandonment of a nonconforming use places no premium on proof of intent to abandon, but instead focuses on actual stoppage or discontinuance of the use. *See* Mont. Cty. Code, § 59–G–4.14 ("A nonconforming use is abandoned if the nonconforming use stops for at least 6 months."). I submit that the mere paper shuffling of the prior tenant in this case did not evince an intent to abandon the nonconforming use sufficient to proclaim abandonment or termination on the part of the property owner who continued the nonconforming use through a subsequent tenant. *See Kastendike v. Baltimore Ass'n for Retarded Children,* 267 Md. 389, 297 A.2d 745 (1972) (mere change of ownership does not destroy a nonconforming use; a use transferred to a successor

in interest will continue to be legal so long as the nature and character of that use is unchanged and substantially the same facilities are used).

The major deviation between the Majority opinion and my view regards whether the automobile filling and service station use operated after the approval of the special exception was carried out solely under the legal authority of the special exception or was a continuation of the nonconforming use. The Majority's facile conclusion that it was the former (*see,* e.g., Maj. op. at 696–97, 912 A.2d at 600—"The automobile filling station was operated under the auspices of the special exception [until revoked on 11 July 2003, at the new tenant's request]—even though it appears that none of the improvements attached as conditions to the special exception ... were made."), is insupportable. It is undisputed that neither the tenant-applicant for the special exception nor the property owner implemented or established any of the improvements or changes in the operation of the use required by the special exception approval. This leads to the inescapable conclusion that the special exception never was established or relied on.

The Montgomery County Board of Appeals's 1997 approval of the special exception in this case included 15 express conditions:

> Accordingly, the Board grants the requested exception and variances subject to the following conditions. The variances [1] are granted subject to condition numbers 1 and 2.

---

1. The Majority opinion claims that "[o]nce the special exception was granted ..., the use of the Property came into conformance with the zoning law; hence, the nonconforming use ceased." Maj. op. at 698, 912 A.2d at 611. This statement is a mere *ipse dixit* and erroneous. Not only would the use not conform with the Zoning Ordinance unless and until all of the conditions of the special exception approval were implemented, the existence of the variances, approved at the same time as the special exception, epitomize why the use as it continued could not be said to be in "conformance with the zoning law" or that the nonconforming use had ceased. The variances, mostly to set-back, landscaping, or screening requirements of the Zoning Ordinance prevailing at the time of approval of the special exception, were acknowl-

1. As required by Section 59–A–1.27, the holder of the special exception is bound by all of its exhibits of record, the testimony of its witnesses and representations of its attorneys, to the extent that such evidence and representations are identified in this Opinion and except as altered by compliance with the following conditions.

2. Construction must conform to Exhibit No. 32(b) [a revised site plan].

3. The holder of the special exception must obtain approval of a stormwater management concept plan or waiver by the Montgomery County Department of Permitting Services prior to issuance of building permits. Particular attention needs to be paid to stormwater collecting on the adjacent properties. Any drainage problem which exists on the rear of the property must be corrected at the time the station renovation takes place.

4. The holder of the special exception must demonstrate compliance with Chapter 31B of the Montgomery County Code (on-site noise).

5. The holder of the special exception must contact the Department of Fire and Rescue Services to ensure compliance with the ordinance regarding the storage and disposal of hazardous materials. There must be no storage of hazardous waste or materials on-site, and no storage of derelict automobiles on-site as specified by the ordinance.

6. The holder of the special exception must request the State Highway Administration to relocate the sidewalk in the right-of-way to improve the pedestrian environment.

---

edged by the Board of Appeals as necessary because of existing conditions as the nonconforming use was being operated, as well as for the proposed improvements under the proposed special exception. Because no improvements were ever implemented, the continued use of the property as it was established in the 1960's continued to represent contravention of a host of Zoning Ordinance requirements.

7. Pick-up of the trash dumpster must not take place before 7:00 AM.

8. Tanker truck deliveries of fuel must not take place between the hours of 11:00 PM and 7:00 AM.

9. Hours of operation of service bays are limited to 6:00 a.m. to 8:00 p.m. with gasoline sales available 24 hours daily.

10. Existing outdoor lifts must be enclosed. Access to these lifts must be provided by two overhead doors, which must be noise-insulating in nature. The new building musts be climate controlled. HVAC unit should not become a nuisance. Sound buffering of unit is required.

11. A 10' high wood wall will be installed along the majority of the rear property boundary and a portion of each side boundary as shown on the revised site plan, Exhibit No. 32(b).

12. The holder of the special exception must submit a landscape and lighting plan, in accord with agreed upon provisions as stated in this Opinion and Exhibit No. 32(b), to Technical Staff for review and approval. In addition, white pines should be of substantial size at planting—approximately 8'–12'. Lighting must be designed so as not to glare into the adjoining residential area. One copy of the approved plan must be submitted to the Zoning Supervisor at the Department of Permitting Services. One copy must be submitted to the Board for its records. All material must be installed according to plan and maintained and replaced as necessary.

13. During hours that the building is closed, convenience items may be sold only through the cash drawer. The building cannot be opened for sale of convenience items only.

14. A 26–foot–high sign is approved subject to approval by Montgomery County Sign Review Board.

15. If the property is sold or the filling station operation conveyed to another company, the new holder of the special exception must notify the Board in writing.

Zoning Ordinance § 59–A–4.53 (b)(2) of the Montgomery County Code provides that "[a] special exception is not valid after 24 months if the use is not established or a building permit is not obtained and construction started within the period." The use in the present case, an automobile filling and service station, was established as a nonconforming use in the 1960's and continued without change or modification after the paper special exception was approved. The use was not established, for purposes of the viability of the special exception, at any time at or after the approval of the special exception. The alternative scenario envisioned by the Zoning Ordinance, the issuance of a building permit where improvements are needed to implement the approved special exception (as was the case for most of the 15 conditions attached to the approval of the special exception), was not fulfilled. Thus, it was entirely correct for the Montgomery County Board of Appeals to declare the special exception (and variances) void because no affirmative actions were taken by the tenants or property owner to effectuate the approval within the time provided by the Zoning Ordinance. *See generally Pemberton v. Montgomery County,* 275 Md. 363, 340 A.2d 240 (1975) (administrative agency's determination of whether a special exception was implemented or abandoned is a mixed question of fact and law and, thus, is entitled to deferential review on judicial review).

Were there evidence in this record that a tenant or the property owner had implemented, or even attempted to implement, any of the conditions of the special exception, or perhaps changed in some meaningful way the use as it operated before the special exception was approved (from which an inference might be drawn that the entity took advantage of the special exception), my view might be different. As noted *supra,* the proper legislative inducements for the elimination of nonconforming uses are economic attrition and physical obsolescence. In a sense, those very factors may have been

on the prior tenant's mind when it applied for the special exception and on the Board of Appeals's mind when it approved the special exception. For example, Shell Oil's purpose in seeking the special exception was described by the Board of Appeals's in its approval as "to upgrade the existing gasoline filling station by installing new pump islands; ... construction of a new canopy; addition of landscaping in the front of the station ...; installation of a new freestanding sign ...; renovation of the exterior of the service station and service bay areas; ... installation of a trash enclosure; installation of new lighting ..." and other site improvements and upgrades. The Board's approval was expressed in terms of permitting a "modernization" and "upgrade" of the existing filling station. Regretfully, not one thing proposed by Shell and approved by the Board ever came to fruition. Accordingly, there is no affirmative evidence that the nonconforming use was abandoned or terminated. At best, despite good intentions, no change in the status quo of the ongoing nonconforming use ever occurred. There is no basis in law or fact for the Majority opinion's contrarian result. The Board of Appeals and the Circuit Court got it right.

I would affirm the judgment of the Circuit Court for Montgomery County.

Judges RAKER and GREENE authorized me to state that they join the views expressed in this dissent.